# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

GARY CHEDWICK,         )
**Individually, and on behalf of a group**  )
**of similarly situated individuals,**    )
        )
        **Plaintiff,**    )
        )
    **v.**        )    **2:07-cv-806**
        )
**UPMC d/b/a UNIVERSITY OF**    )
**PITTSBURGH MEDICAL CENTER,**  )
        )
        **Defendant.**    )

## MEMORANDUM OPINION AND ORDER OF COURT

Before the Court for disposition is DEFENDANT'S MOTION TO DISMISS PLAINTIFF'S COMPLAINT (*Document No. 3*), Defendant's Brief in Support of Motion to Dismiss (*Document No. 4*), and Plaintiff's Response to Defendant's Motion to Dismiss (*Document No. 6*). For the reasons that follow, Defendant's Motion to Dismiss will be granted in part and denied in part.

### Procedural History and Background

The context of the present motion can best be understood by reference to two similar cases. *Bolden v. Magee-Women's Hospital of the University of Pittsburgh Medical Center*, Civil Action No. 05-1063 (the "Bolden Action") was commenced in this Court on August 1, 2005. Bolden Action, 05-1063, Doc. No. 1. That action was brought solely under the Americans with Disabilities Act of 1990 [42 U.S.C. § 12101 *et seq.*] (the "ADA"). Carole Bolden ("Bolden"), the plaintiff in the Bolden Action, filed a Motion for Leave to File Amendment Complaint on May 30, 2006, seeking to add Valentina Tish ("Tish") as a plaintiff. Bolden Action, 05-1063, Doc. No. 15. On June 13, 2006, the Court denied Bolden's Motion for Leave to File Amended Complaint. Relying on the decision of the United States Court of Appeals for the Third Circuit in *Averbach v. Rival Manufacturing Co.*, 879 F.2d 1196, 1203 (3d Cir. 1989), the Court

1

determined that the transformation of the Bolden Action into a class action would "unduly delay" its resolution. Bolden Action, 05-1063, Doc. No. 17, p. 1. The Court further noted that the employment discrimination claims alleged in the proposed Amended Complaint in Class Action were not the sort of claims that were typically or appropriately resolved via class action litigation. *Id.* It was determined that the "hypothetical question" of whether the cases of Bolden and Tish should be consolidated was unlikely to be resolved in favor of consolidation. *Id.* In denying Bolden's motion, the Court ultimately based its decision on the grounds of undue delay and futility of amendment. *Id.*, pp. 1-2, quoting *Averbach*, 879 F.2d at 1203 ("Factors the trial court may appropriately consider in denying a motion to amend include undue delay, undue prejudice to the opposing party, and futility of amendment."). The language in the opinion discussing the propriety of class action certification must be read in that context. As an additional basis for denying Bolden's motion, the Court determined that amendment of the complaint would be futile because Bolden's charge with the Equal Employment Opportunity Commission ("EEOC") pursuant to 42 U.S.C. §§ 2000e-5 and 12117(a) had not been filed as a class action. Bolden Action, 05-1063, Doc. No. 17, p. 2.

On June 21, 2006, Tish commenced her own action, *Tish v. Magee-Women's Hospital*, Civil Action No. 06-820 (the "Tish Action"), against Magee-Women's Hospital ("Magee"), alleging that Magee violated her rights under the Rehabilitation Act of 1973 [29 U.S.C. § 701 *et seq.*] (the "Rehabilitation Act"). Tish Action, 06-820, Doc. No. 1. Tish asserted class allegations under both the ADA and the Rehabilitation Act. The Court held a status conference in the Bolden Action on August 11, 2006. Bolden was permitted to renew her request to file an amended complaint.

In an opinion dated October 5, 2006, the Court again denied Bolden's request for leave to file an amended complaint. Bolden Action, 05-1063, Doc. No. 27. Relying on *In re Burlington Coat Factory*, 114 F.3d 1410, 1434 (3d Cir. 1997), the Court noted that leave to amend could be denied upon a finding of undue delay, bad faith, dilatory motive, prejudice to the defendant, or futility of amendment. *Id.*, p. 2. Leave to amend was denied on the basis of both futility of amendment and the likelihood that the proposed amendment would cause undue delay. *Id.* Discovery in the Bolden Action was wrapping up, and the Court was concerned that resolution of

that case would be "significantly delayed" if Bolden were permitted to amend her complaint. *Id.* With respect to the issue of futility, the Court again took note of the fact that Bolden's EEOC charge could not serve as a predicate for other potential class members to avoid the exhaustion of their administrative remedies, since Bolden had not made class-based allegations. *Id.*, p. 4. Given that the "purported class members could not piggyback on Bolden's EEOC charge," the Court concluded that it would be futile to permit the amendment sought by Bolden. *Id.* Hence, the Bolden Action was not viewed as offering any "substantive advantage to the purported plaintiff class" when compared to the Tish Action. *Id.* The Court went on to say that, due to the individualized nature of the inquiries required under the ADA and the Rehabilitation Act, the allegations contained in Bolden's proposed amended complaint were "not the sort of claims that would *ordinarily* be appropriate for resolution in a class action." *Id.*, p. 5 (emphasis added). At no point did the Court hold that claims under the ADA and the Rehabilitation Act were *categorically* inappropriate for resolution in a class action.

On July 26, 2006, relying on Federal Rule of Civil Procedure 12(b)(6), Magee filed a Motion to Dismiss in the Tish Action, seeking the dismissal of Tish's ADA claims. Tish Action, 06-820, Doc. No. 3. Tish responded on August 15, 2006, by filing a Motion for Joinder pursuant to Federal Rule of Civil Procedure 20. Tish Action, 06-820, Doc. No. 8. She sought to join her action with the Bolden Action. The Court disposed of both motions on October 17, 2006. Tish Action, 06-820, Doc. No. 10. Since Tish had not exhausted her administrative remedies pursuant to 42 U.S.C. §§ 2000e-5 and 12117(a), the Court dismissed her claims under the ADA. *Id.*, p. 2. Accordingly, Tish was allowed to proceed only under the Rehabilitation Act. Tish's Motion for Joinder was denied for reasons similar to those relied upon by the Court in denying Bolden's requests for leave to amend. Since neither Bolden nor Tish had exhausted the administrative prerequisites to a class action claim under the ADA, the Court concluded that joinder of the two actions would be futile. *Id.* ("The Court concluded that because Bolden's EEOC charge cannot serve as the predicate for other potential class members to avoid the exhaustion requirement, amendment of the Bolden Action to assert class allegations under the ADA would be futile. For the same reasons, the class action allegations under the ADA in the Tish Action must also fail."). Magee was ordered to file an answer to Tish's Rehabilitation Act averments within ten days of

the Court's order.  *Id.*, p. 3.

On October 25, 2006, eight days after the Court denied Tish's Motion for Joinder, Tish filed an Amended Complaint in Class Action.  Tish Action, 06-820, Doc. No. 11.  This Amended Complaint was filed without leave of Court.  The Amended Complaint purported to add Gary Chedwick ("Chedwick"), Barbara Fowler ("Fowler"), Gloria Hamlett ("Hamlett"), and Terri Walsh ("Walsh") as plaintiffs and UPMC St. Margaret, UPMC Shadyside, UPMC Montefiore and UPMC d/b/a University of Pittsburgh Medical Center ("UPMC") as defendants.  The Amended Complaint alleged violations of both the ADA and the Rehabilitation Act, averring that Hamlett and Walsh had exhausted their administrative remedies before the EEOC and received right to sue letters dated October 20, 2006, and October 17, 2006, respectively.  *Id.*, p. 2, ¶ 4.

The UPMC entities filed a Motion to Strike the Amended Complaint on November 8, 2006.  Tish Action, 06-820, Doc. No. 13.  They contended that the Court's granting of Magee's Motion to Dismiss had terminated Tish's right to amend her complaint "once as a matter of course" under Federal Rule of Civil Procedure 15(a), and that the filing of the Amended Complaint was improper because leave to amend had not been granted by the Court.  In support of their Motion to Strike, the UPMC entities also argued that joinder of the parties was improper under Federal Rule of Civil Procedure 20.  The UPMC entities likewise filed an Alternative Motion to Sever under Federal Rule of Civil Procedure 21, contending that prejudice would result if the claims asserted in the Amended Complaint were to be tried in a single action.  *Id.*

Meanwhile, discovery in the Bolden Action concluded, and Magee moved for summary judgment in that case on November 13, 2006.  Bolden Action, 05-1063, Doc. No. 28.  The Court issued decisions in both cases on April 24, 2007.  Magee was granted summary judgment in the Bolden Action.  *Bolden v. Magee Women's Hospital*, 2007 WL 1228479, 2007 U.S. Dist. LEXIS 30127 (W.D.Pa. April 24, 2007).  In *Tish v. Magee-Women's Hospital*, 2007 WL 1221137, at *5, 2007 U.S. Dist. LEXIS 30130, at *12-15 (W.D.Pa. April 24, 2007), the Court adopted the construction of Rule 15(a) advanced by the UPMC entities, holding that Tish's right to amend her complaint "once as a matter of course" had terminated when the Court granted Magee's Motion to Dismiss.  Nevertheless, the Court treated Tish's filing of the Amended Complaint as a request for leave to amend, granting the request.  *Tish*, 2007 WL 1221137, at *6-7, 2007 U.S.

Dist. LEXIS 30130, at *15-20.  The UPMC entities argued that they would be prejudiced if Tish were permitted to file the Amended Complaint, since the allegations made by the plaintiffs involved "fact-specific complaints against distinct business units within UPMC."  *Tish*, 2007 WL 1221137, at *6, 2007 U.S. Dist. LEXIS 30130, at *17.  In granting Tish's implied request for leave to amend, the Court accommodated the UPMC entities' concerns about prejudice by granting their Alternative Motion to Sever.  *Tish*, 2007 WL 1221137, at *7, 2007 U.S. Dist. LEXIS 30130, at *18 ("While the prejudice identified by Defendants could be viewed as a factor counseling against leave to amend at this time, any such prejudice would be obviated if the Court were to grant Defendants' Alternative Motion to Sever.").  Hence, the Court severed the claims asserted by Chedwick, Fowler, Hamlett and Walsh from the Tish Action pursuant to Federal Rule of Civil Procedure 21.  *Tish*, 2007 WL 1221137, at *8, 2007 U.S. Dist. LEXIS 30130, at *21-22.  The instant case is one of the cases that was severed from the Tish Action on April 24, 2007.

UPMC, the defendant in this case, has filed a Motion to Dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6).  Doc. No. 3.  Since the matter comes before the Court in this posture, the allegations contained in the Complaint are assumed to be true.  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 127 S.Ct. 2499, 2509 (2007).  Although "heightened fact pleading of specifics" is not required for a plaintiff to survive a motion to dismiss, a complaint must contain "enough facts to state a claim to relief that is plausible on its face."  *Bell Atlantic Corporation v. Twombly*, 127 S.Ct. 1955, 1974 (2007).

Chedwick brings this action against UPMC both individually and on behalf of similarly situated individuals.  Doc. No. 1, ¶ 1.  He seeks declaratory, injunctive and compensatory relief from UPMC for the denial of employment opportunities on the basis of his status as a "qualified individual with a disability."  *Id.*, ¶¶ 1-2, 6.  Jurisdiction is predicated on 28 U.S.C. §§ 1331 and 1343.  Venue is proper under 28 U.S.C. § 1391(b).

Chedwick is an adult individual who resides in Munhall, Pennsylvania.  *Id.*, ¶ 6.  UPMC is a Pennsylvania corporation existing for the purpose of operating a system of healthcare facilities and research centers.  *Id.*, ¶ 7.  It maintains its corporate headquarters in Pittsburgh, Pennsylvania.  *Id.*  UPMC's network includes 19 hospitals.  *Id.*  In addition, UPMC maintains

other healthcare facilities which service 29 different counties.  *Id.*  Roughly 40,000 people are employed by UPMC.  *Id.*  Since UPMC receives federal financial assistance, it is covered under the Rehabilitation Act.  29 U.S.C. § 794(a)-(b).  Moreover, since UPMC has "15 or more employees for each working day in each of 20 or more calendar weeks in the current or preceding calendar year" and is "engaged in an industry affecting commerce[,]" it is an "employer" within the meaning of the ADA.  42 U.S.C. § 12111(5)(A).

Chedwick was most recently employed by UPMC as an Interface Analyst III.  Doc. No. 1, ¶ 10.  He suffers from Post Traumatic Stress Disorder ("PTSD") resulting from his experience in the military during the conflict in Vietnam.  *Id.*, ¶ 11.  For the purpose of deciding the instant Motion to Dismiss, the Court will assume *arguendo* that Chedwick is a "qualified individual with a disability" within the meaning of 42 U.S.C. § 12111(8).  *Id.*, ¶¶ 12-14.  Chedwick last worked for UPMC in December 2003, when he suffered a "severe episode" related to his PTSD.  *Id.*, ¶ 15.  In January 2004, he was placed on UPMC's short-term disability plan, and later on long-term disability through Unum.[1]  *Id.*, ¶ 16.  UPMC denied Chedwick's "return to work plan" in July 2004.  *Id.*, ¶ 17.  Chedwick was terminated by UPMC on July 31, 2004.  *Id.*, ¶ 18.

In October 2005, Chedwick's long-term disability carrier, Unum, released him to work.  *Id.*, ¶ 19.  Chedwick applied for 28 different positions at UPMC, including the position that he had held at the time of his termination.  *Id.*, ¶ 20.  He avers that he was never considered for any of these positions because of his disability.  *Id.*, ¶ 21.  On August 14, 2006, Chedwick filed a charge of discrimination with the EEOC pursuant to 42 U.S.C. §§ 2000e-5 and 12117(a).[2]  *Id.*, ¶ 22.  He avers that UPMC terminated him because of his disability, and that UPMC denied him

---

[1]Although the Complaint states that Chedwick was placed on disability during the month of January 2003, the context makes it clear that January 2004 is the month intended to be named in the averment.  Doc. No. 1, ¶ 16.  The Court assumes that Chedwick's use of "2003" rather than "2004" is the result of a typographical error.

[2]The EEOC charge itself is presently before the Court as a part of the record.  Doc. Nos. 3-2, 6-2.  Chedwick signed the charge on August 14, 2006.  Doc. Nos. 3-2, p. 1, 6-2, p. 2.  The EEOC acknowledged receipt of the charge in a letter to Chedwick's attorney dated August 16, 2006.  Doc. No. 6-2, p. 1.  The Complaint lists August 16, 2006, as the date on which the charge was filed.  Doc. No. 1, ¶ 22.

the chance to return to work (presumably by not hiring him for any of the 28 positions for which he applied) because of his disability. *Id.*, ¶¶ 23-24. He bases his complaint on UPMC's failure to engage in an "interactive process" for the purpose of transferring him to a vacant position pursuant to his "return to work plan," or to consider him for the positions for which he applied subsequent to his termination. *Id.*, ¶ 25. Chedwick claims that UPMC's conduct caused him to suffer the loss of wages and job benefits, and that it caused him to endure emotional harm. *Id.*, ¶ 26. He alleges that UPMC's disparate treatment of him on account of his disability was intentional, and that UPMC acted with reckless disregard as to his rights under the ADA and the Rehabilitation Act. *Id.*, ¶¶ 27-28.

The Complaint also contains class allegations under both the ADA and the Rehabilitation Act. *Id.*, ¶¶ 29-38. Chedwick avers that his action against UPMC is brought, and may properly be maintained, as a class action under Federal Rule of Civil Procedure 23. *Id.*, ¶ 30. He brings this action on his own behalf and "as representative of the proposed class consisting of all persons who have been terminated or separated from employment following a leave of absence and/or otherwise not accommodated by [UPMC's] failure to transfer to vacant and funded positions." *Id.*, ¶ 31. He avers that Rule 23's prerequisites to a class action can be satisfied in this case. *Id.*, ¶¶ 32-38.

<u>Discussion</u>

UPMC has filed a Motion to Dismiss the Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). Doc. No. 3. The grounds for dismissal in UPMC's Motion to Dismiss are rather specific and straightforward. The Court will address each of the three specific issues raised by UPMC.

UPMC seeks the dismissal of Chedwick's ADA claims on the ground that the filing of his EEOC charge was untimely. Doc. No. 3, pp. 6-7, ¶¶ 29-34. The parties agree that, because of Pennsylvania's status as a "deferral state" (i.e., a state which has its own law prohibiting the same practices as the ADA, and which authorizes an agency to grant or seek relief from such practices), Chedwick had 300 days from the time of the alleged discrimination to file his EEOC charge in accordance with 42 U.S.C. §§ 2000e-5(e)(1) and 12117(a). *Seredinski v. Clifton Precision Products Co.*, 776 F.2d 56, 61-62 (3d Cir. 1985). It is undisputed that Chedwick's

"return to work plan" was denied by UPMC in July 2004, and that he was terminated on July 31, 2004. Doc. No. 1, ¶¶ 17-18. It is also undisputed that his EEOC charge was not filed until August 14, 2006. Doc. Nos. 3-2, p. 1, 6-2, p. 2.

UPMC seeks the dismissal of Chedwick's ADA claims for two reasons. First, UPMC argues that Chedwick's averments concerning the denial of his "return to work plan" and UPMC's decision to terminate him are time-barred because they occurred more than 300 days prior to the filing of his EEOC charge. Doc. No. 4, pp. 7-8. Second, UPMC contends that Chedwick's averments concerning UPMC's failure to hire him in October 2005 are time-barred because they did not toll the 300-day charging period for purposes of his discharge. *Id.*, pp. 8-11. The Court will address each of these arguments *seriatim*.

With respect to the denial of Chedwick's "return to work plan" in July 2004, and his termination on July 31, 2004, the Court does not understand his ADA claims to be based on such averments. In his responsive brief, Chedwick does not dispute that his allegations concerning UPMC's actions in July 2004 are time-barred insofar as they are based on the ADA. He argues that the allegations concerning UPMC's failure to rehire him in October 2005 are not time-barred, since this alleged conduct occurred within the 300-day charging period (i.e., within the 300 days immediately preceding the filing of Chedwick's EEOC charge). Doc. No. 6, pp. 3-5. The Court notes that, on his EEOC charge form, Chedwick listed October 20, 2005, as the *earliest* date on which UPMC's unlawful discrimination occurred. Doc. Nos. 3-2, p. 1, 6-2, p. 2. The Court understands October 20, 2005, to be the date on which Chedwick applied for a new position with UPMC after being "released" to return to work. Indeed, the Court has before it an email from UPMC dated October 21, 2005, acknowledging receipt of Chedwick's application for an Interface Analyst II position. Doc. No. 6-3, p. 1. This was apparently the first of the 28 jobs for which Chedwick ultimately applied. Hence, Chedwick apparently bases his ADA claims *solely* on UPMC's failure to hire him on or after October 20, 2005.

UPMC argues that Chedwick's allegations concerning its failure to hire him on or after October 20, 2005, are likewise time-barred. Doc. No. 4, pp. 8-11. In support of its position, UPMC relies on the unpublished decision of the United States Court of Appeals for the Third Circuit in *Gloeckl v. Giant Eagle, Inc.*, 176 Fed.Appx. 324 (3d Cir. April 20, 2006). In *Gloeckl*,

the Court of Appeals rejected a claim by a plaintiff who argued that the relevant adverse action for purposes of the 300-day charging period was not the date of her termination (i.e., the date on which she was told that she could not return to work in any capacity), but rather the last date on which the defendant advertised a need for an employee capable of performing the duties of a job similar to that sought by the plaintiff. *Gloeckl*, 176 Fed.Appx. at 326 ("Gloeckl, on the other hand, contends that the unlawful employment action occurred when Giant Eagle failed to consider her requests for funded part-time work that became available and was advertised in November 2001."). The Court of Appeals held that since the date of the plaintiff's termination was not within the charging period, her action was time-barred. *Id.* There was no evidence that the plaintiff had formally applied for subsequent positions with the defendant.

The instant case is materially different. Chedwick avers that, after being "released" to return to work in October 2005, he applied for 28 different positions with UPMC. Doc. No. 1, ¶ 20. The Court has before it emails sent by UPMC to Chedwick acknowledging receipt of his applications for some of those positions. Doc. No. 6-3, pp. 1-11. Chedwick alleges that he was never considered for any of these positions *because of his disability*. Doc. No. 1, ¶ 21. The applicable provision of the ADA provides:

> **§ 12112. Discrimination**
> **(a) General rule.** No covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.

42 U.S.C. § 12112(a). The plain language of the statute makes it clear that adverse "hiring" decisions and adverse "discharge" decisions made *because of an individual's disability* are independently violative of the ADA. With respect to the issue of timeliness, the United States Supreme Court explained in *National Railroad Passenger Corporation v. Morgan*, 536 U.S. 101 (2002), that "[d]iscrete acts such as termination, failure to promote, denial of transfer, or refusal to hire are easy to identify." *Morgan*, 536 U.S. at 114. The Supreme Court went on to note that "[e]ach incident of discrimination and each retaliatory adverse employment decision constitutes a *separate* actionable 'unlawful employment practice.'" *Id.* (emphasis added). Thus, the Supreme

Court has made it clear that the language in the ADA means what it says (i.e., that discriminatory "hiring" and "discharge" decisions are independently actionable).[3]

Chedwick does not dispute that his averments concerning the events of July 2004, which appear to allege both a discriminatory "failure to transfer" and a discriminatory "discharge," are time-barred with respect to the ADA.  Doc. No. 6, pp. 3-5.  He nevertheless contends that his averments concerning UPMC's alleged failure to hire him on or after October 20, 2005, are timely because UPMC's alleged conduct occurred within the 300-day charging period.  *Id.*  The Court finds his argument to be persuasive.  Since UPMC's alleged discriminatory failures to "hire" Chedwick constituted violations of the ADA separate and distinct from the discriminatory conduct alleged to have occurred in July 2004, Chedwick's claims are not time-barred insofar as they are based on UPMC's alleged failure to hire him on or after October 20, 2005.  *O'Connor v. City of Newark*, 440 F.3d 125, 127 (3d Cir. 2006)(describing termination, failure to promote, denial of transfer, refusal to hire, wrongful suspension, wrongful discipline, denial of training, and wrongful accusation as a "non-exhaustive list of discrete acts for which the limitations period runs from the act").  It appears to the Court that Chedwick never intended for his ADA claims to be based on the alleged events of July 2004, since the date listed on his EEOC charge form as the *earliest* date of the alleged discrimination was October 20, 2005.  Doc. Nos. 3-2, p. 1, 6-2, p. 2.  Nonetheless, it must be acknowledged that the Complaint is somewhat confusing as to this issue.  Doc. No. 1, ¶ 23 ("Mr. Chedwick was *terminated* because he was disabled, regarded by defendants, UPMC, as disabled, and/or had a record of disability within the meaning of the Rehabilitation Act *and the ADA*.")(emphasis added).  Accordingly, for the sake of clarity, the Court will grant UPMC's Motion to Dismiss insofar as Chedwick's Complaint is construed to allege that UPMC's conduct in July 2004 violated the ADA.  Doc. No. 3, ¶ 31.  The Motion to

---

[3]The Court acknowledges that *National Railroad Passenger Corporation v. Morgan*, 536 U.S. 101 (2002), concerned Title VII of the Civil Rights Act of 1964 [42 U.S.C. § 2000e *et seq.*] rather than the ADA.  Nevertheless, Title I of the ADA incorporates Title VII's remedial scheme, making the Supreme Court's reasoning in *Morgan* equally applicable to this case.  42 U.S.C. § 12117(a); *O'Connor v. City of Newark*, 440 F.3d 125, 128 (3d Cir. 2006)(explaining that "the distinction between 'continuing violations' and 'discrete acts' is not an artifact of Title VII, but is rather a generic feature of federal employment law").

Dismiss will be denied to the extent that it seeks the dismissal of Chedwick's averments concerning UPMC's failure to hire him on or after October 20, 2005. *Id.*, ¶ 32.

UPMC also seeks the dismissal of Chedwick's Rehabilitation Act claims. Doc. No. 3, ¶¶ 26-28. The ground asserted for the dismissal of the Rehabilitation Act claims is the Pennsylvania two-year statute of limitations, which is codified at 42 Pa.C.S. § 5524. *Id.* UPMC contends that regardless of whether the Court views the applicable tolling date as October 25, 2006 (the date on which the Amended Complaint was purportedly filed in the Tish Action) or June 15, 2007 (the date on which this case was filed as an individual case in accordance with the Court's severance order in *Tish*), more than two years elapsed between the time of Chedwick's discharge and the commencement of this action. Doc. No. 3, ¶ 28, n. 2. With respect to Chedwick's averments concerning UPMC's failure to hire him on or after October 20, 2005, the Court's earlier discussion about the ADA claims applies with equal force to the Rehabilitation Act claims. The Rehabilitation Act incorporates the standards contained in Title I of the ADA for the purpose of determining whether an alleged act of employment discrimination constitutes a violation of the Rehabilitation Act. 29 U.S.C. § 794(d). Since the Court has already concluded that UPMC's alleged failures to hire Chedwick because of his disability constituted violations of the ADA separate and distinct from its prior decision to terminate him, the Complaint also alleges violations of the Rehabilitation Act which occurred within the two-year period immediately preceding the commencement of this action (even if the Court assumes *arguendo* that the statute of limitations was not tolled until June 15, 2007).[4] For this reason, it is clear that the Court must deny UPMC's Motion to Dismiss insofar as it seeks the dismissal of Chedwick's Rehabilitation

_____

[4] The Rehabilitation Act makes the "remedies, procedures and rights" set forth in Title VI of the Civil Rights Act of 1964 available to those whose substantive rights under Section 504 of the Rehabilitation Act are violated. 29 U.S.C. § 794a(a)(2). Title VI provides for the termination of federal funding if a covered entity fails to comply with its substantive provisions. 42 U.S.C. § 2000d-1. Title VI contains no express private right of action. Nonetheless, the Supreme Court has found an implied private right of action within Title VI, which has been acknowledged by Congress in subsequent statutory amendments. *Barnes v. Gorman*, 536 U.S. 181, 185 (2002). Since Congress has incorporated Title VI's remedial scheme into the Rehabilitation Act, plaintiffs alleging violations of Section 504 have a private right of action under federal law. *Three Rivers Center for Independent Living, Inc. v. Housing Authority of Pittsburgh*, 382 F.3d 412, 425-426 (3d Cir. 2004).

Act claims for conduct of UPMC on or after October 20, 2005.

Chedwick's Rehabilitation Act claims concerning the denial of his "return to work plan" in July 2004, and his termination on July 31, 2004, present a more complicated question. UPMC argues that they are subject to Pennsylvania's two-year statute of limitations and, hence, subject to dismissal at this time.[5] Doc. No. 4, pp. 5-7. In support of its argument, UPMC points out that the Rehabilitation Act does not contain its own statute of limitations. *Id.*, pp. 5-6. For this reason, UPMC believes that this Court must "borrow" the two-year statute of limitations applicable to similar claims arising under Pennsylvania law. *Wilson v. Garcia*, 471 U.S. 261, 266-267 (1985)("When Congress has not established a time limitation for a federal cause of action, the settled practice has been to adopt a local time limitation as federal law if it is not inconsistent with federal law or policy to do so."); *Swierkowski v. CONRAIL*, 168 F.Supp.2d 389, 393-394 (E.D.Pa. 2001)(applying Pennsylvania's two-year statute of limitations to a claim arising under the Rehabilitation Act). Chedwick counters UPMC's argument by contending that his "failure to transfer" Rehabilitation Act claims are subject to the four-year statute of limitations established by 28 U.S.C. § 1658. Doc. No. 6, pp. 1-3. According to Chedwick, his averments concerning UPMC's conduct in July 2004 were timely filed in accordance with § 1658. The relevant statutory language provides:

> **§ 1658. Time limitations on the commencement of civil actions arising under Acts of Congress**
> (a) Except as otherwise provided by law, a civil action arising under an Act of Congress enacted after the date of the enactment of this section [enacted Dec. 1, 1990] may not be commenced later than 4 years after the cause of action accrues.

28 U.S.C. § 1658(a). The dispositive question is whether Chedwick's Rehabilitation Act claims *arise under* an Act of Congress enacted after December 1, 1990.

The Rehabilitation Act was originally enacted in 1973. Pub. L. No. 93-112, 87 Stat. 355

---

[5]The United States Court of Appeals for the Third Circuit permits a defendant to seek the dismissal of a claim on statute of limitations grounds pursuant to a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) where the times alleged in the complaint make it clear that the claim is subject to such an affirmative defense. *Robinson v. Johnson*, 313 F.3d 128, 135 (3d Cir. 2002).

(1973). Prior to 2004, this Court's inquiry would have been over. In *Zubi v. AT&T Corp.*, 219 F.3d 220, 225 (3d Cir. 2000), the United States Court of Appeals for the Third Circuit adopted a "bright line" test for determining whether a civil action *arises under* an Act of Congress enacted after December 1, 1990. *Zubi*, 219 F.3d at 225 ("The underlying rationale of that reading is that when Congress amends a preexisting statute it does not create a 'new act,' and claims arising under the statute as amended continue to arise under the preexisting statute."). Under the Court of Appeals' "bright line" test, courts within this circuit had to view the applicable federal statute as an undifferentiated whole, without regard to whether certain types of claims became actionable only because of amendments enacted subsequent to December 1, 1990. *Id.* at 225-226. If the holding in *Zubi* was still the governing standard, UPMC would be entitled to the dismissal of Chedwick's Rehabilitation Act claims insofar as they are based on UPMC's conduct in July 2004. However, the United States Supreme Court expressly abrogated *Zubi* in *Jones v. R.R. Donnelley & Sons Company*, 541 U.S. 369, 374-375 (2004).

In *Jones*, speaking through Justice Stevens, a unanimous Supreme Court declared that "a cause of action 'aris[es] under an Act of Congress enacted' after December 1, 1990–and therefore is governed by § 1658's 4-year statute of limitations–if the plaintiff's claim against the defendant was made possible by a post-1990 enactment." *Jones*, 541 U.S. at 382. The Supreme Court explained:

> Nothing in the text or history of § 1658 supports an interpretation that would limit its reach to entirely new sections of the United States Code. An amendment to an existing statute is no less an "Act of Congress" than a new, stand-alone statute. What matters is the substantive effect of an enactment–the creation of new rights of action and corresponding liabilities–not the format in which it appears in the Code.

*Id.* at 381. In light of *Jones*, it is clear that the argument of UPMC paints with too broad a brush. Doc. No. 3, ¶ 26 ("A two-year statute of limitations applies to Plaintiff's claims under the Rehabilitation Act."). The Rehabilitation Act cannot be viewed as an undifferentiated whole for the purpose of determining whether § 1658 is applicable in this case. The Supreme Court has clearly rejected the language in *Zubi* which limited the application of § 1658 to entirely new statutes enacted after December 1, 1990. *Jones*, 541 U.S. at 380-381 ("The history that led to the

enactment of § 1658 strongly supports an interpretation that fills more rather than less of the void that has created so much unnecessary work for federal judges. The interpretation favored by respondent and the Court of Appeals subverts that goal by restricting § 1658 to cases in which the plaintiff's cause of action is based solely on a post-1990 statute that 'establishes a new cause of action without reference to preexisting law.'"). Thus, within the context of the present case, the Court must determine whether Chedwick's Rehabilitation Act claims arise under an amendment enacted subsequent to December 1, 1990, which *enlarged the category of conduct* that is subject to Rehabilitation Act liability. *Id.* at 383. With that in mind, the Court now turns to the applicable statutory language contained in the Rehabilitation Act and the ADA.

Section 504 of the Rehabilitation Act provides that "No otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . ." 29 U.S.C. § 794(a). Chedwick avers (and UPMC does not dispute) that UPMC receives federal financial assistance. Doc. No. 1, ¶ 8. In 1992, Congress added the following language to Section 504:

> **(d) Standards used in determining violation of section.** The standards used to determine whether this section has been violated in a complaint alleging employment discrimination under this section shall be the standards applied under title I of the Americans with Disabilities Act of 1990 (42 U.S.C. 12111 et seq.) and the provisions of sections 501 through 504, and 510, of the Americans with Disabilities Act of 1990 (42 U.S.C. 12201-12204 and 12210), as such sections relate to employment.

29 U.S.C. § 794(d). The legislation which added this language to Section 504 was signed into law by President George H.W. Bush on October 29, 1992. Pub. L. No. 102-569, § 506, 106 Stat. 4344, 4428 (1992); Statement on Signing the Rehabilitation Act Amendments of 1992, 28 Weekly Comp. Pres. Doc. 2198 (Oct. 29, 1992). Thus, if any of Chedwick's Rehabilitation Act claims *arise under* 29 U.S.C. § 794(d) under the test established by the Supreme Court in *Jones*, such claims are subject to the four-year statute of limitations contained in § 1658 rather than the two-year statute of limitations contained in § 5524. If any of Chedwick's claims were actionable under the Rehabilitation Act prior to the enactment of § 794(d) in 1992, such claims remain

subject to § 5524's two-year statute of limitations.

As always, the Court's analysis begins with the statutory language being construed in this case. Since § 794(d) incorporates the substantive provisions of Title I of the ADA for the purpose of determining whether a recipient of federal financial assistance has engaged in a form of employment discrimination proscribed by the Rehabilitation Act, the Court must turn to the applicable provisions of Title I.[6] As noted earlier, Chedwick's Complaint alleges violations of Title I's substantive prohibition, which is codified at 42 U.S.C. § 12112(a). Since it is undisputed that UPMC is covered under the Rehabilitation Act, and that the Rehabilitation Act incorporates § 12112(a) for the purpose of determining whether a recipient of federal funding has engaged in unlawful employment discrimination, the first question that must be answered is whether § 12112(a)'s use of the word "discriminate" encompasses conduct which was not prohibited under the Rehabilitation Act prior to 1992. If that question yields a positive answer, the Court must then decide whether the conduct alleged in the Complaint falls within that

---

[6]The Court does not believe that the effective date of Title I of the ADA is relevant for the purpose of determining whether Chedwick's claims arise under 29 U.S.C. § 794(d), since it is clear that § 794(d) was itself enacted after December 1, 1990. Nevertheless, it is worth noting that Title I did not become effective until July 26, 1992. President George H.W. Bush signed the ADA into law on July 26, 1990, but Title I did not become effective until two years after the date of its enactment. Pub. L. No. 101-336, § 108, 104 Stat. 327, 337 (1990)("This title shall become effective 24 months after the date of enactment."); *Burfield v. Brown, Moore & Flint, Inc.*, 51 F.3d 583, 588 (5th Cir. 1995)(recognizing July 26, 1992, as the date on which Title I of the ADA went into effect, and stating that "[t]he ADA is not retroactive" and, hence, "does not apply to actions allegedly taken prior to the effective date of the Act"). It is unclear whether a civil action arising under a statutory provision signed into law prior to December 1, 1990, but becoming effective subsequent to that date, would constitute "a civil action arising under an Act of Congress *enacted* after" December 1, 1990. 28 U.S.C. § 1658(a)(emphasis added). The Court has no occasion to reach that question, however, since the relevant statutory provision is § 794(d), which was not signed into law until October 29, 1992. Pub. L. No. 102-569, § 506, 106 Stat. 4344, 4428 (1992); Statement on Signing the Rehabilitation Act Amendments of 1992, 28 Weekly Comp. Pres. Doc. 2198 (Oct. 29, 1992). Claims arising directly under Title I of the ADA, of course, are not subject to either 28 U.S.C. § 1658 or 42 Pa.C.S. § 5524. Instead, they are subject to the enforcement provisions contained in 42 U.S.C. § 2000e-5, which are incorporated within Title I by 42 U.S.C. § 12117(a). 28 U.S.C. § 1658(a)("*Except as otherwise provided by law*, a civil action arising under an Act of Congress enacted after the date of the enactment of this section [enacted Dec. 1, 1990] may not be commenced later than 4 years after the cause of action accrues.")(emphasis added).

category (i.e., conduct which was not prohibited under the Rehabilitation Act prior to 1992 but which is now prohibited thereunder because of § 794(d)'s enactment). The Court will proceed to address these two questions in sequential order.

Title I provides a rule of construction concerning the word "discriminate." 42 U.S.C. § 12112(b). The relevant statutory language provides:

> **(b) Construction.** As used in subsection (a), the term "discriminate" includes--
>
> ***
> (5)(A) not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity; or
> (B) denying employment opportunities to a job applicant or employee who is an otherwise qualified individual with a disability, if such denial is based on the need of such covered entity to make reasonable accommodation to the physical or mental impairments of the employee or applicant[.]

42 U.S.C. § 12112(b)(5)(A)-(B). The ADA defines the term "reasonable accommodation" in 42 U.S.C. § 12111(9), which provides:

> (9) Reasonable accommodation. The term "reasonable accommodation" may include--
> (A) making existing facilities used by employees readily accessible to and usable by individuals with disabilities; and
> (B) job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities.

42 U.S.C. § 12111(9). Since § 794(d) incorporates § 12112(a)'s use of the term "discriminate" into the Rehabilitation Act, the ADA's definitions are controlling in this case with respect to Chedwick's claims under the Rehabilitation Act. Hence, Chedwick was "subjected to discrimination" by UPMC "solely by reason of . . . his disability" if he was denied the "reasonable accommodation" of "reassignment to a vacant position[.]" 29 U.S.C. § 794(a); 42 U.S.C. §§ 12111(9)(B) and 12112(b)(5)(A)-(B). The dispositive question is whether this same

form of "discrimination" was proscribed by Section 504 of the Rehabilitation Act prior to the enactment of § 794(d) in 1992. It is that inquiry to which the Court now turns.

Before the enactment of § 794(d), the Rehabilitation Act's implied "reasonable accommodation" requirement was governed by 45 C.F.R. § 84.12(a), an implementing regulation which provided that a recipient of federal funds "shall make reasonable accommodation to the known physical or mental limitations of an otherwise qualified handicapped applicant or employee unless the recipient can demonstrate that the accommodation would impose an undue hardship on the operation of its program."[7] *Nathanson v. The Medical College of Pennsylvania*, 926 F.2d 1368, 1383 (3d Cir. 1991). What was considered to be a "reasonable accommodation" under this more generalized standard was determined on a case-by-case basis. *Id.* at 1385. In *School Board of Nassau County v. Arline*, 480 U.S. 273 (1987), the Supreme Court made the following observation about the Rehabilitation Act in a footnote:

> Employers have an affirmative obligation to make a reasonable accommodation for a handicapped employee. Although they are not required to find another job for an employee who is not qualified for the job he or she was doing, they cannot deny an employee alternative employment opportunities reasonably available under the employer's existing policies.

*Arline*, 480 U.S. at 289, n. 19. This language appears to have limited the "reassignment to a vacant position" inquiry under the pre-1992 Rehabilitation Act to the question of whether a covered employer has denied a handicapped employee alternative positions for which he or she

---

[7]Title I of the ADA codifies a similar standard by defining the word "discriminate" to include "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity[.]" 42 U.S.C. § 12112(b)(5)(A). The term "reasonable accommodation," of course, now includes "reassignment to a vacant position[.]" 42 U.S.C. § 12111(9)(B). This standard is now incorporated within the Rehabilitation Act via 29 U.S.C. § 794(d). The term "reasonable accommodation," as used in 45 C.F.R. § 84.12(a) and quoted in *Nathanson v. The Medical College of Pennsylvania*, 926 F.2d 1368, 1383 (3d Cir. 1991), was not defined broadly enough to include "reassignment to a vacant position." *Gile v. United Airlines*, 95 F.3d 492, 496-497 (7th Cir. 1996)("Until recently, the Rehabilitation Act and its regulations did not include reassignment to a vacant position within the list of potential reasonable accommodations.").

would have qualified *under the employer's existing policies*. *Fedro v. Reno*, 21 F.3d 1391, 1395-1397 (7th Cir. 1994); *Guillot v. Garrett*, 970 F.2d 1320, 1326-1327 (4th Cir. 1992). This standard differs meaningfully from that contained in Title I of the ADA, which equates an employer's failure to transfer a disabled employee under particular circumstances with prohibited discrimination without reference to the employer's own policies. 42 U.S.C. §§ 12111(9)(B), 12112(a)-(b)(5)(A)-(B).

In support of his position that the Rehabilitation Act would not have required UPMC to transfer him to a vacant position prior to 1992, Chedwick relies on *Bratten v. SSI Services, Inc.*, 185 F.3d 625 (6th Cir. 1999). In *Bratten*, the United States Court of Appeals for the Sixth Circuit expressly recognized that the enactment of § 794(d) resulted in the addition of "reassignment to a vacant position" as a required accommodation under the Rehabilitation Act, and that this statutory amendment had effected a change to (rather than a *post hoc* codification of) preexisting law. *Bratten*, 185 F.3d at 633 ("Prior to 1992, the Rehabilitation Act did not include re-assignment to a vacant position as a reasonable accommodation."). Chedwick also cites *Gile v. United Airlines*, 95 F.3d 492 (7th Cir. 1996), in which the United States Court of Appeals for the Seventh Circuit made a similar observation. *Gile*, 95 F.3d at 496-497 ("Until recently, the Rehabilitation Act and its regulations did not include reassignment to a vacant position within the list of potential reasonable accommodations."). Although neither party specifically cites a precedent which binds this Court as to the issue, the Court has independently discovered that the United States Court of Appeals for the Third Circuit has already taken the same position as that taken by the Sixth and Seventh Circuits in *Bratten* and *Gile*. In *Shiring v. Runyon*, 90 F.3d 827 (3d Cir. 1996), the Court of Appeals explicitly recognized § 794(d) as the source of a disabled employee's right to be reassigned to a vacant position under the Rehabilitation Act. *Shiring*, 90 F.3d at 831-832. The Court of Appeals also noted that no such right had existed under the Rehabilitation Act prior to the enactment of § 794(d). *Id.* at 831 ("Before 1992, disabled individuals had to prove that they were qualified only for the job that they were employed to do."). *Shiring* compels the conclusion that the Rehabilitation Act would not have required UPMC to reassign Chedwick to a vacant position prior to 1992.

Since the use of the word "discriminate" in § 12112(a) encompasses conduct which was

not proscribed by the Rehabilitation Act before the enactment of § 794(d), the Court must determine whether Chedwick properly alleges conduct falling within that category. Chedwick alleges that UPMC denied his "return to work plan" in July 2004.[8] Doc. No. 1, ¶ 17. Although this averment is somewhat vague in character, it must be read in light of a subsequent averment which confirms that Chedwick is relying on a "reassignment to a vacant position" theory. *Id.*, ¶ 25 ("Although Mr. Chedwick's efforts to engage in the interactive process by producing a return to work plan and attempting to transfer or otherwise obtain vacant and funded job positions were sufficient to meet his burden in accordance with the interactive process as set forth in the ADA and Rehabilitation Act, UPMC, violated its duty to properly engage in the interactive process."). Chedwick's allegations, of course, are assumed to be true. *Tellabs*, 127 S.Ct. at 2509. He clearly alleges that UPMC's failure to accommodate his disability stems from its failure to reassign him to a vacant position. Hence, he alleges that UPMC engaged in conduct which violates the Rehabilitation Act today, but which did not violate the Rehabilitation Act prior to the enactment of § 794(d).

Given the holdings in *Jones* and *Shiring*, it is clear that Chedwick's Rehabilitation Act claims are governed by the four-year statute of limitations in § 1658, and not the two-year statute of limitations in § 5524, at least insofar as they are based on a "reassignment to a vacant position" theory.[9] *Jones*, 541 U.S. at 383 ("Because petitioners' hostile work environment,

_____

[8]In *Bell Atlantic Corporation v. Twombly*, 127 S.Ct. 1955 (2007), the United States Supreme Court stated that a complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corporation*, 127 S.Ct. at 1974. The Court has no occasion to consider whether Chedwick's allegations satisfy this standard. UPMC moves for the dismissal of Chedwick's Rehabilitation Act claims *solely* on the ground that they are barred by Pennsylvania's two-year statute of limitations. Doc. No. 3, ¶¶ 26-28. Since UPMC does not challenge the sufficiency of Chedwick's allegations on a substantive basis, the Court's inquiry is limited to the statute of limitations issue.

[9]UPMC remains free to argue, at a later stage, that the type of "discrimination" established by the evidentiary record would have been actionable under the Rehabilitation Act prior to the enactment of 29 U.S.C. § 794(d). The Court cannot predict what discovery will reveal. At this stage, the Court must assume that Chedwick's allegations are true, and that the "reasonable accommodation" to which he was entitled consisted of a "reassignment to a vacant position." Doc. No. 1, ¶ 25.

wrongful termination, and failure-to-transfer claims did not allege a violation of the pre-1990 version of § 1981 but did allege violations of the amended statute, those claims 'ar[ose] under' the amendment to § 1981 contained in the 1991 Act.")(brackets in original). There is no need for the Court to consider which statute of limitations governs Chedwick's averments concerning UPMC's failure to hire him on or after October 20, 2005, since those alleged acts or omissions occurred recently enough to satisfy the two-year statute of limitations that UPMC contends should be borrowed from Pennsylvania law. Doc. No. 4, pp. 5-7. UPMC's Motion to Dismiss will be denied with respect to Chedwick's claims under the Rehabilitation Act. Doc. No. 3, ¶¶ 26-28.

UPMC also moves for the dismissal of Chedwick's class action averments. Doc. No. 3, ¶¶ 35-41. In so doing, UPMC relies primarily on the "law of the case" doctrine, which generally precludes a court from reconsidering issues previously decided within the context of the same case. *Fagan v. City of Vineland*, 22 F.3d 1283, 1290 (3d Cir. 1994). UPMC relies on this Court's prior rulings in *Bolden* and *Tish* as a basis for arguing that the issue of class certification has already been decided in this case. Doc. No. 4, pp. 11-16. At the outset, it is worth noting that the "law of the case" doctrine, even where applicable, does not limit this Court's authority. Instead, it merely expresses *common judicial practice*. *Castro v. United States*, 540 U.S. 375, 384 (2003). Moreover, the Court is convinced that the doctrine is not applicable, since today's decision constitutes the Court's *first* ruling in this case.

In *Tish*, the Court severed this action from the Tish Action pursuant to Federal Rule of Civil Procedure 21 upon the granting of Tish's implied request for leave to file the Amended Complaint. *Tish*, 2007 WL 1221137, at *6-7, 2007 U.S. Dist. LEXIS 30130, at *15-20. Since this case was severed from the Tish Action pursuant to the same ruling which granted Tish leave to file the Amended Complaint, this action has essentially been a separate case from its inception. In granting the UPMC entities' Alternative Motion to Sever, the Court accepted their argument that they would be prejudiced if Tish were permitted to file the Amended Complaint. *Tish*, 2007 WL 1221137, at *7, 2007 U.S. Dist. LEXIS 30130, at *18 ("While the prejudice identified by Defendants could be viewed as a factor counseling against leave to amend at this time, any such prejudice would be obviated if the Court were to grant Defendant's Alternative Motion to

Sever."). As Chedwick points out, the Court's severance order in *Tish* was issued to alleviate the prejudice that would have resulted had the Court allowed Tish to file the Amended Complaint without severing the different parties and claims. Doc. No. 6, p. 11. Prejudice to a defendant is recognized as a ground for denying leave to amend a complaint, and the Court had to take that factor into consideration when ruling on Tish's implied request for leave to file the Amended Complaint. *Averbach*, 879 F.2d at 1203 ("Factors the trial court may appropriately consider in denying a motion to amend include undue delay, undue prejudice to the opposing party, and futility of amendment."). At no point did the Court consider the propriety of class certification outside of that context.

The Court's severance order in *Tish* was influenced by another factor. In the Bolden Action, Jane Tibbott ("Tibbott") testified that each business unit within the UPMC system had adopted UPMC's corporate policy at a different time. *Tish*, 2007 WL 1221137, at *7, 2007 U.S. Dist. LEXIS 30130, at *19, n. 1. The Court was concerned that a single trial involving multiple UPMC defendants would result in prejudice to some of the UPMC entities. *Id.* ("It may be that each business unit was still operating under its own unique policy during the periods of alleged discrimination, and that these claims cannot be viewed through the same prism of UPMC's corporate policy."). Bolden and Tish were both employed by Magee. Chedwick was apparently employed directly by UPMC. Doc. No. 6, p. 12. This Court has not examined the issue of class certification in this context before, and UPMC's belief to the contrary is inaccurate. The "law of the case" doctrine does not prevent the Court from taking a fresh look at the issue of class certification in this case, especially since that issue was addressed in *Tish* only insofar as it was relevant to the question of whether Tish's filing of the Amended Complaint would result in prejudice to UPMC's different business units. *Ogbudimkpa v. Ashcroft*, 342 F.3d 207, 210, n. 7 (3d Cir. 2003)(explaining that the "law of the case" doctrine should not be mechanically applied in instances where the issue alleged to have been previously decided was discussed only within the context of a distinct inquiry with which it was "inextricably intertwined").

UPMC's reliance on *Chinn v. Giant Food, Inc.*, 100 F.Supp.2d 331 (D.Md. 2000), is misplaced. Doc. No. 4, p. 13. In *Chinn*, the United States District Court for the District of Maryland was faced with an attorney who was seeking to "judge-shop" by manipulating the

judicial process for the purpose of rejoining the same parties which had already been severed by a prior order. *Chinn*, 100 F.Supp.2d at 333. This case does not involve the abuse or manipulation of the judicial process. *Tish*, 2007 WL 1221137, at *6, 2007 U.S. Dist. LEXIS 30130, at *16 ("Since the position taken by Plaintiffs with respect to the Rule 15(a) issue is supported by Seventh Circuit case law and two decisions of district courts within this circuit, it cannot be said that the Amended Complaint was filed in bad faith. The Court does not view Plaintiffs' desire to amend as a tactic to delay the Tish Action, but rather as an expression of their preference to pursue the matter as a class action."). *Chinn* does not counsel in favor of the dismissal of Chedwick's class action allegations in this case.

The Court acknowledges that it placed some reliance on the "fact-specific, individualized determinations" required under the ADA and the Rehabilitation Act in granting the Alternative Motion to Sever in *Tish*. *Tish*, 2007 WL 1221137, at *6, 2007 U.S. Dist. LEXIS 30130, at *17. As noted earlier, however, the Court's discussion about the ADA and the Rehabilitation Act was limited to the issue of prejudice. The Court did not hold that claims arising under the ADA and the Rehabilitation Act were *categorically* inappropriate for resolution within the context of a class action. Some ADA and Rehabilitation Act cases may properly be adjudicated as class actions. *Hohider v. United Parcel Service*, 243 F.R.D. 147 (W.D.Pa. 2007). Thus, the Court does not agree with the UPMC argument that Chedwick's averments fail to satisfy the requirements of Rule 23(a) as a matter of law. Doc. No. 4, p. 16.

Chedwick apparently believes that UPMC's corporate policies are not in compliance with the decision of the United States Court of Appeals for the Third Circuit in *Shapiro v. The Township of Lakewood*, 292 F.3d 356 (3d Cir. 2002). Doc. No. 6, p. 9. In *Shapiro*, the Court of Appeals made it clear that a plaintiff proceeding under the ADA pursuant to a "failure to transfer" theory is not necessarily required to establish that he or she formally applied for another position. *Shapiro*, 292 F.3d at 360-361. Chedwick alleges that UPMC requires its employees on disability leave to formally apply for vacant positions without regard to whether they are entitled to reasonable accommodations under the ADA and the Rehabilitation Act. Doc. No. 1, ¶ 33. It would be premature to dismiss Chedwick's class action averments at this early stage. The Court will deny UPMC's Motion to Dismiss with respect to these averments, since the issue of class

certification will be more appropriately addressed when the record is more fully developed.

## Conclusion

The averments concerning UPMC's failure to hire Chedwick on or after October 20, 2005, allege violations of the ADA that are separate and distinct from UPMC's alleged actions in July 2004. *Morgan*, 536 at 114. Insofar as Chedwick's ADA claims are based on UPMC's alleged failure to hire him during the 300-day charging period, UPMC's Motion to Dismiss will be denied. Doc. No. 3, ¶¶ 29-34. UPMC's Motion to Dismiss will be granted with respect to Chedwick's ADA claims only to the extent that those claims are based on UPMC's conduct prior to the charging period (i.e., the allegations concerning UPMC's conduct in July 2004). *Id.* Because Chedwick's "failure to transfer" claims under the Rehabilitation Act arise under 29 U.S.C. § 794(d), which was enacted after December 1, 1990, they are subject to the four-year statute of limitations contained in 28 U.S.C. § 1658(a). *Jones*, 541 U.S. at 383; *Shiring*, 90 F.3d at 831-832. UPMC's Motion to Dismiss will be denied with respect to Chedwick's claims under the Rehabilitation Act. Doc. No. 3, ¶¶ 26-28. The Court has not addressed the propriety of a class action against UPMC outside of the context of motions for leave to file amended complaints in the Bolden and Tish Actions. Moreover, both the Bolden Action and the Tish Action involved employees of Magee rather than those employed directly by UPMC. It would be premature for the Court to dismiss Chedwick's class action averments at this stage, since the record has not yet been developed. The Court will deny UPMC's Motion to Dismiss with respect to Chedwick's class action averments. *Id.*, ¶¶ 35-41. When the record is more fully developed, the Court will be in a better position to determine whether this case may proceed as a class action pursuant to Federal Rule of Civil Procedure 23. At this time, the Court expresses no opinion as to whether certification in this case would be appropriate. An appropriate order follows.


McVerry, J.

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **GARY CHEDWICK,** | ) | |
| **Individually, and on behalf of a group** | ) | |
| **of similarly situated individuals,** | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **2:07-cv-806** |
| | ) | |
| **UPMC d/b/a UNIVERSITY OF** | ) | |
| **PITTSBURGH MEDICAL CENTER,** | ) | |
| **Defendant.** | ) | |

## ORDER OF COURT

AND NOW, this 12th day of December, 2007, in accordance with the foregoing memorandum opinion, it is hereby **ORDERED, ADJUDGED and DECREED** that Defendant's Motion to Dismiss (*Document No. 3*) is **GRANTED** insofar as it seeks the dismissal of Plaintiff's ADA claims based on conduct alleged to have occurred in July 2004 and **DENIED** insofar as it seeks the dismissal of Plaintiff's ADA claims, Rehabilitation Act claims and class action averments, based on Defendant's alleged failure to hire him on or after October 20, 2005.

Defendant shall file an answer to Plaintiff's Complaint on or before **December 27, 2007.**

BY THE COURT:

s/ Terrence F. McVerry
United States District Court Judge

cc: Gregory G. Paul
Email: gpaul@peircelaw.com

Pamela G. Cochenour
Email: pgc@pbandg.com