**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **GARY CHEDWICK,** | ) | |
| **Individually, and on behalf of a group** | ) | |
| **of similarly situated individuals,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No. 07-806** |
| | ) | |
| **UPMC d/b/a UNIVERSITY OF** | ) | |
| **PITTSBURGH MEDICAL CENTER,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**MEMORANDUM OPINION AND ORDER OF COURT**

Before the Court for disposition are the PLAINTIFF'S MOTION FOR CLASS
CERTIFICATION (*Document No. 57*), the Plaintiff's brief and exhibits in support of class
certification (*Document No. 58*), and the Defendant's brief and appendix in opposition to class
certification (*Document No. 62*). For the reasons that follow, the Plaintiff's Motion for Class
Certification will be denied.

**Procedural History**

The procedural background to this controversy dates back to August 1, 2005, when
Carole C. Bolden ("Bolden"), a former employee of Magee-Women's Hospital of the University
of Pittsburgh Medical Center ("Magee"), commenced an action ("Bolden Action") against
Magee under the Americans with Disabilities Act of 1990 ("ADA") [42 U.S.C. § 12101 *et seq.*].
Civil Action No. 05-1063, ECF No. 1. Bolden alleged that Magee had unlawfully terminated her
employment pursuant to a policy providing that an employee could not remain on medical leave
for more than six months. *Id.* at ¶ 36. On May 30, 2006, Bolden sought leave to file an amended
complaint in class action based on Magee's alleged violations of both the ADA and the
Rehabilitation Act of 1973 ("Rehabilitation Act") [29 U.S.C. § 701 *et seq.*]. Civil Action No.
05-1063, ECF No. 15. The amended complaint proposed by Bolden would have added
Valentina Tish ("Tish"), another former employee of Magee, as a plaintiff. Civil Action No. 05-
1063, ECF No. 15-2. The Court denied Bolden's request for leave to amend on June 13, 2006.
Civil Action No. 05-1063, ECF No. 17. In denying the request, the Court explained that the

"proposed transformation" of the case into a class action would "unduly delay" its resolution, and that disability-based discrimination claims of the kind asserted by Bolden were not typically amenable to adjudication within the context of a class action. *Id.* at 1.

Tish responded on June 21, 2006, by filing a separate action ("Tish Action") against Magee, alleging that she had been discharged in violation of the Rehabilitation Act. Civil Action No. 06-820, ECF No. 1. Her complaint included class allegations under both the ADA and the Rehabilitation Act. *Id.* at ¶¶ 20-29. Magee filed a motion to dismiss on July 26, 2006, seeking the dismissal of Tish's ADA claims on the ground that she had not exhausted her administrative remedies with the Equal Employment Opportunity Commission ("EEOC"). Civil Action No. 06-820, ECF No. 3.

During the course of a status conference conducted on August 11, 2006, the Court permitted Bolden to renew her request for leave to file an amended complaint. Four days later, Tish responded to Magee's motion to dismiss by filing a motion for joinder pursuant to Federal Rule of Civil Procedure 20. Civil Action No. 06-820, ECF No. 8. She sought to join her action with the Bolden Action. *Id.* Bolden's renewed motion for leave to amend was filed on August 25, 2006. Civil Action No. 05-1063, ECF No. 23. The Court denied Bolden's motion on October 5, 2006, repeating its earlier admonition that the allegations contained in the proposed amended complaint were "not the sort of claims that would ordinarily be appropriate for resolution in a class action." Civil Action No. 05-1063, ECF No. 27 at 5. In a memorandum order dated October 17, 2006, the Court granted Magee's motion to dismiss Tish's ADA claims and denied Tish's motion for joinder. Civil Action No. 06-820, ECF No. 8.

On October 25, 2006, Tish filed an amended complaint purporting to add Gary Chedwick ("Chedwick"), Barbara Fowler ("Fowler"), Gloria Hamlett ("Hamlett"), and Terri Walsh ("Walsh") as plaintiffs and the University of Pittsburgh Medical Center ("UPMC"), UPMC Shadyside, UPMC St. Margaret and UPMC Montefiore as defendants. Civil Action No. 06-820, ECF No. 11. The UPMC entities filed a motion to strike the amended complaint on November 8, 2006. Civil Action No. 06-820, ECF No. 13. The motion to strike was accompanied by an alternative motion to sever filed pursuant to Federal Rule of Civil Procedure 21. *Id.* Five days later, Magee moved for summary judgment in the Bolden Action. Civil Action No. 05-1063, ECF No. 28.

In a memorandum opinion and order dated April 24, 2007, the Court granted Magee's motion for summary judgment in the Bolden Action. *Bolden v. Magee Women's Hospital*, Civil Action No. 05-1063, 2007 WL 1228479, 2007 U.S. Dist. LEXIS 30127 (W.D.Pa. Apr. 24, 2007). In a separate memorandum opinion and order issued that same day, the Court treated Tish's filing of an amended complaint in the Tish Action as an implied request for leave to amend, granted that request, and denied the motion to strike that had been filed by the UPMC entities. *Tish v. Magee-Women's Hospital*, Civil Action No. 06-820, 2007 WL 1221137, at *6-8, 2007 U.S. Dist. LEXIS 30130, at *15-22 (W.D.Pa. Apr. 24, 2007). In order to alleviate any prejudice to the UPMC entities, the Court granted their alternative motion to sever and directed Chedwick, Fowler, Hamlett and Walsh to refile their actions as separate cases. *Id.*

Pursuant to the severance order, Chedwick commenced this action against UPMC on June 15, 2007, alleging violations of the ADA and the Rehabilitation Act. ECF No. 1. His complaint included class allegations. *Id.* at ¶¶ 29-39. On August 28, 2007, UPMC moved to dismiss Chedwick's class allegations, arguing that they were violative of the severance order. ECF No. 3 at ¶¶ 35-41. The Court rejected UPMC's argument on December 12, 2007, holding that the severance order entered in the Tish Action did not preclude Chedwick from seeking class certification in this case. *Chedwick v. UPMC*, 619 F.Supp.2d 172, 187-190 (W.D.Pa. 2007).

On June 8, 2008, the United States Court of Appeals for the Third Circuit affirmed this Court's decision which granted summary judgment in favor of Magee in the Bolden Action. *Bolden v. Magee Women's Hospital*, 281 Fed. Appx. 88 (3d Cir. 2008). Eight days later, Magee filed a motion for summary judgment in the Tish Action. Civil Action No. 06-820, ECF No. 29. The motion was denied on October 27, 2008. *Tish v. Magee-Women's Hospital*, Civil Action No. 06-820, 2008 WL 4790733, 2008 U.S. Dist. LEXIS 87010 (W.D.Pa. Oct. 27, 2008). The parties later stipulated to the dismissal of the Tish Action after advising the Court that they had decided to resolve their dispute through settlement. Civil Action No. 06-820, ECF Nos. 47-49.

*Hohider v. United Parcel Service, Inc.*, 574 F.3d 169 (3d Cir. 2009), was decided by the Third Circuit Court of Appeals on July 23, 2009. In *Hohider*, the Court of Appeals reversed a class-certification order which had been entered in a case involving alleged violations of the ADA. *Hohider*, 574 F.3d at 171. Speaking through Chief Judge Scirica, the Court of Appeals explained that a determination as to whether the defendant had engaged in the pattern of unlawful discrimination alleged by the plaintiffs would "encompass inquiries" that were "too

individualized and divergent" with respect to the defined class to warrant certification under Federal Rule of Civil Procedure 23. *Id.* at 186.

UPMC filed a motion for partial summary judgment on September 30, 2009, contending that *Hohider* precluded the Court from certifying a class in this case. ECF Nos. 32 & 33. The motion was not accompanied by evidentiary submissions. ECF No. 33 at 1, n. 1. In essence, UPMC argued that cases involving alleged violations of the ADA and the Rehabilitation Act were *categorically* outside of the certification criteria contained in Rule 23, and that *Hohider* had foreclosed any possibility that a class could be certified in this case. *Id.* at 4-6. The Court denied the motion on November 9, 2009, holding that "cases brought under the ADA and the Rehabilitation Act [were] not *categorically* beyond the purview of Rule 23." *Chedwick v. UPMC*, 263 F.R.D. 269, 276 (W.D.Pa. 2009)(emphasis in original).

Chedwick filed a motion for class certification on November 30, 2010, seeking to certify a class consisting of "all former employees of UPMC for all business units from 2004 through the present who were on a medical leave of absence and automatically terminated after twenty-six weeks." ECF No. 57 at ¶ 3. That motion is the subject of this memorandum opinion.

## Standard of Review

The standards for determining whether a class should be certified are governed by Federal Rule of Civil Procedure 23. Subsections (a) and (b) of Rule 23 provide:

**(a) Prerequisites.** One or more members of a class may sue or be sued as representative parties on behalf of all members only if:
    (1) the class is so numerous that joinder of all members is impracticable;
    (2) there are questions of law or fact common to the class;
    (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
    (4) the representative parties will fairly and adequately protect the interests of the class.

**(b) Types of Class Actions.** A class action may be maintained if Rule 23(a) is satisfied and if:
    (1) prosecuting separate actions by or against individual class members would create a risk of:
        (A) inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class; or
        (B) adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would

> substantially impair or impede their ability to protect their
> interests;
> (2) the party opposing the class has acted or refused to act on grounds that
> apply generally to the class, so that final injunctive relief or corresponding
> declaratory relief is appropriate respecting the class as a whole; or
> (3) the court finds that the questions of law or fact common to class
> members predominate over any questions affecting only individual
> members, and that a class action is superior to other available methods for
> fairly and efficiently adjudicating the controversy. The matters pertinent
> to these findings include:
>> (A) the class members' interests in individually controlling the
>> prosecution or defense of separate actions;
>> (B) the extent and nature of any litigation concerning the
>> controversy already begun by or against class members;
>> (C) the desirability or undesirability of concentrating the litigation
>> of the claims in the particular forum; and
>> (D) the likely difficulties in managing a class action.

FED. R. CIV. P. 23(a)-(b). In order to establish entitlement to class certification, a party must satisfy all four of the prerequisites found in Rule 23(a) and at least one of the criteria found in Rule 23(b). *Danvers Motor Co., Inc. v. Ford Motor Co.*, 543 F.3d 141, 147 (3d Cir. 2008). A motion for class certification does not justify "a preliminary inquiry into the merits of a suit in order to determine whether it may be maintained as a class action." *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 177, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974). Nevertheless, there are circumstances in which the issues relevant to class certification are entangled with the merits of a claim. *Coopers & Lybrand v. Livesay*, 437 U.S. 463, 469, 98 S.Ct. 2454, 57 L.Ed.2d 351 (1978). A court presented with a motion for class certification may not decline to resolve factual disputes relevant to the applicable class-certification requirements merely because they overlap with the factual issues surrounding an underlying cause of action. *In re: Hydrogen Peroxide Antitrust Litigation*, 552 F.3d 305, 316 (3d Cir. 2008). Although the factual findings made by a court in this context are conclusive for the purpose of class certification, they do not bind the trier of fact when the merits of the underlying claims are considered. *Id.* at 318. "Factual determinations supporting Rule 23 findings must be made by a preponderance of the evidence." *Id.* at 307.

## **Factual Background**

Chedwick allegedly suffers from post-traumatic stress disorder ("PTSD") as a result of his military service during the conflict in Vietnam. ECF No. 1 at ¶ 11. He was employed by UPMC as an Interface Analyst III prior to the events at issue in this case. ECF No. 1 at ¶ 10. On

November 19, 2003, Chedwick left his work station without authorization. ECF No. 62-5 at 2. UPMC responded by requiring Chedwick to serve an uncompensated suspension from November 24, 2003, through November 28, 2003. ECF No. 62-5 at 3. John Truxal ("Truxal"), Chedwick's supervisor, and Rhonda Larimore ("Larimore"), UPMC's Human Resources Manager, met with Chedwick on December 8, 2003, to discuss his past conduct and their expectations concerning his future performance. ECF No. 62-19 at 2-4. During the course of a deposition conducted on September 23, 2010, Chedwick acknowledged that he had left his work station without the permission of his superiors, and that UPMC had been justified in suspending him without pay for five days. ECF No. 62-4 at 11-12; Chedwick Dep. at 32, 35.

Chedwick never returned to work after the meeting of December 8, 2003. ECF No. 62-4 at 12; Chedwick Dep. at 35. During the meeting, he attributed his conduct to his PTSD. ECF No. 62-19 at 2. The Family and Medical Leave Act of 1993 ("FMLA") [29 U.S.C. § 2601 *et seq.*] provides that an eligible employee is "entitled to a total of 12 workweeks of leave during any 12-month period for . . . a serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1)(D). Chedwick formally requested a leave of absence on January 16, 2004, claiming that he was being treated for "severe depression" and PTSD. ECF No. 62-6 at 2. His request was approved, and he started to receive disability benefits pursuant to UPMC's policy with UNUM Provident. ECF No. 1 at ¶ 16.

In a letter dated March 24, 2004, Matthew Rimer ("Rimer"), a UPMC Human Resources Generalist, informed Chedwick that his FMLA leave was about to expire on March 30, 2004, and that he was expected to return to work on that date. ECF No. 62-7 at 2. Rimer's letter also stated that UPMC's corporate policy provided Chedwick with the option to apply for a personal leave of absence lasting up to fourteen weeks if he was not ready to resume his duties following the expiration of his FMLA leave. *Id.* Chedwick exercised this option and remained on leave for an additional fourteen weeks.

On July 2, 2004, Larimore sent Chedwick a letter which stated the following:

> Your 26-week leave of absence (combination of FMLA and personal leave) expires on July 6, 2004. The University of Pittsburgh Medical Center policy states that the total amount of leave may not exceed 26 weeks in any rolling 12-month period. As such, you will be removed from the University of Pittsburgh Medical Center's payroll and your employment terminated effective July 6, 2004.

> You will continue to receive Short Term Disability or Long Term Disability benefits as approved through UNUM Provident. Information regarding options for post-employment continuation of your health insurance benefits (COBRA) will be forwarded to you as well.
>
> Should you wish to reapply for employment with the University of Pittsburgh Medical Center after you are fully released by your physician, please visit upmc.com to apply online. Please contact me at (412) 647-1955 if you have any questions regarding this matter.
>
> Thank you for your contributions to the University of Pittsburgh Medical Center. I wish you a quick recovery, and the best of luck in the future.

ECF No. 62-9 at 2. UNUM Provident proposed a "return-to-work plan" permitting Chedwick to perform some of his duties at home and some of his duties at UPMC's facility, but UPMC rejected that idea. ECF No. 62-4 at 21; Chedwick Dep. at 49. Chedwick's employment relationship with UPMC was terminated on July 6, 2004.

During the fall of 2005, UNUM Provident determined that Chedwick's medical condition had improved enough to facilitate his return to work. This determination was communicated to UPMC on October 7, 2005, by means of a letter from Stephanie Perry ("Perry"), a Lead Disability Benefits Specialist for UNUM Provident, to Jodi Clark ("Clark"), a UPMC employee. ECF No. 62-12 at 2. UNUM Provident provided Chedwick with three months of advanced benefits and closed his disability claim as of January 1, 2006. *Id.* The advanced benefits were provided in order to give Chedwick sufficient time to secure gainful employment. *Id.* Chedwick was also afforded the benefit of vocational counseling. *Id.*

In October 2005, Chedwick started to submit applications for vacant positions advertised by UPMC. ECF No. 62-4 at 9; Chedwick Dep. at 23. He avers that he applied for at least twenty-eight different positions, including the position that he had previously held. ECF No. 1 at ¶ 20. Chedwick further alleges that UPMC never considered him for these positions because he was suffering from PTSD. *Id.* at ¶ 21.

Chedwick filed a charge of discrimination with the EEOC on August 14, 2006, alleging that UPMC had discharged him, and refused to rehire him, because of his "disability."[1] ECF No. 62-3 at 3-4. After exhausting his administrative remedies with the EEOC, Chedwick sought to

---

[1] In his EEOC charge, Chedwick also alleged that UPMC had discriminated against him because of his age. ECF No. 62-3 at 2-4. His complaint in this Court, however, does not allege that UPMC violated his rights under the Age Discrimination in Employment Act of 1967 ("ADEA") [29 U.S.C. § 621 *et seq.*]. ECF No. 1.

become a plaintiff in the Tish Action by means of the amended complaint filed on October 25, 2006. Civil Action No. 06-820, ECF No. 11. He commenced this action against UPMC on June 15, 2007, in accordance with the severance order of April 24, 2007. ECF No. 1 at ¶ 4.

**Discussion**

**A.     Overview**

Title I of the ADA contains provisions which govern the conduct of covered employers in relation to their current and prospective employees. 42 U.S.C. §§ 12101-12117. Title I's anti-discrimination provision, which is codified at 42 U.S.C. § 12112(a), provides that "[n]o covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."[2] 42 U.S.C. § 12112(a). The term "qualified individual" is defined as "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). The "discrimination" prohibited by § 12112(a) is defined broadly enough to include a covered entity's failure or refusal to "mak[e] reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity," or its "den[ial of] employment opportunities to a job applicant or employee who is an otherwise qualified individual with a disability, if such denial is based on the need of such covered entity to make reasonable accommodation[s] to the physical or mental impairments of the employee or applicant . . . ." 42 U.S.C. § 12112(b)(5)(A)-(B). In this context, "reasonable accommodations" may include "job restructuring," a "part-time or modified" work schedule, or a "reassignment to a vacant position." 42 U.S.C. § 12111(9)(B).

---

[2] At the time of Chedwick's termination, § 12112(a) provided that "[n]o covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." Pub. L. No. 101-336, § 102; 104 Stat. 327, 331-332 (1990), (previously codified at 42 U.S.C. § 12112(a)). The language of this anti-discrimination provision was changed by the ADA Amendments Act of 2008, which took effect on January 1, 2009. Pub. L. No. 110-325, § 5; 122 Stat. 3553, 3557 (2008); 42 U.S.C. § 12112(a). Chedwick seeks to certify a class consisting of persons who were terminated by UPMC both before and after January 1, 2009. ECF No. 57 at ¶ 3. The Court quotes the current version of the statute in order to speak in the present tense. The linguistic change to § 12112(a) made by the statutory amendment is not germane to the class-certification inquiry. *Chedwick v. UPMC*, 263 F.R.D. 269, 275, n. 8 (W.D.Pa. 2009).

Section 504 of the Rehabilitation Act, which is codified at 29 U.S.C. § 794(a), provides that "[n]o otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . ." 29 U.S.C. § 794(a). The standards used for determining whether a recipient of federal funding has violated this statutory provision in the employment setting are identical to those used for determining whether a covered entity has violated Title I of the ADA. 29 U.S.C. § 794(d). Chedwick avers that UPMC is both a "covered entity" within the meaning of the ADA and a recipient of federal financial assistance under the Rehabilitation Act. ECF No. 1 at ¶¶ 7-9; 29 U.S.C. § 794(b); 42 U.S.C. § 12111(2), (5)(A).

The complaint alleges violations of both the ADA and the Rehabilitation Act. ECF No. 1 at ¶¶ 10-28. When he filed his EEOC charge, Chedwick listed October 20, 2005, as the *earliest* date on which he had been subjected to discrimination prohibited under the ADA. ECF No. 62-3 at 3. As the Court has already explained, Chedwick's ADA claims concern only UPMC's conduct relating to the job applications submitted on or after October 20, 2005. *Chedwick*, 619 F.Supp.2d at 178-181. On August 28, 2007, UPMC moved for the dismissal of Chedwick's ADA claims to the extent that they were based on the termination decision of July 6, 2004, contending that they had not been exhausted before the EEOC within the applicable 300-day charging period. ECF No. 3 at ¶¶ 29-34. The Court granted that portion of UPMC's motion "for the sake of clarity," since the language of the complaint was "somewhat confusing" as to whether Chedwick was relying on the ADA to challenge his discharge. *Chedwick*, 619 F.Supp.2d at 180. It was noted that Chedwick's "failure-to-hire" claims had been properly exhausted, since they were based on "separate and distinct" violations of the ADA. *Id.*

In support of its motion to dismiss, UPMC also argued that Chedwick could not challenge his discharge under the Rehabilitation Act, since his complaint had been filed more than two years after the termination decision. ECF No. 4 at 5-7. This argument was squarely rejected. Relying on the decision of the United States Supreme Court in *Jones v. R.R. Donnelley & Sons Co.*, 541 U.S. 369, 124 S.Ct. 1836, 158 L.Ed.2d 645 (2004), the Court held that the Rehabilitation Act claims concerning Chedwick's discharge, to the extent that they were based on a "failure-to-transfer" theory that would not have been viable under the pre-1992 version of the Rehabilitation Act, had been properly asserted within the four-year limitations period

applicable under 28 U.S.C. § 1658(a). *Chedwick*, 619 F.Supp.2d at 181-187. This Court's reasoning as to that issue was subsequently adopted by the United States Court of Appeals for the Third Circuit in *Fowler v. UPMC Shadyside*, 578 F.3d 203, 206-209 (3d Cir. 2009).[3] Therefore, Chedwick clearly has a claim before the Court relating to UPMC's discharge decision of July 6, 2004.[4]

Throughout the course of this litigation, Chedwick has consistently maintained that UPMC discharged him, and refused to rehire him, because of an actual or perceived disability. ECF No. 1 at ¶¶ 23-24. A plaintiff seeking to establish a *prima facie* case of discrimination under the ADA or the Rehabilitation Act must ordinarily show both that he or she suffers from an actual or perceived "disability" (*i.e.*, "a physical or mental impairment that substantially limits one or more [of his or her] major life activities") and that he or she is "qualified" for the position held or desired (*i.e.*, capable of performing the "essential functions" of the position "with or without reasonable accommodation"). 42 U.S.C. §§ 12102(1)(A), 12111(8); *Gaul v. Lucent Technologies, Inc.*, 134 F.3d 576, 580 (3d Cir. 1998). In *Hohider*, the Court of Appeals concluded that the inquiry as to whether the proposed class members were "qualified" for their respective positions would require too many "individualized and divergent" determinations to facilitate the adjudication of their claims on a classwide basis. *Hohider*, 574 F.3d at 185-186. Nonetheless, the Court of Appeals suggested that a case involving alleged violations of the ADA or the Rehabilitation Act could be maintained as a class action if the class definition contained

---

[3] *Fowler v. UPMC Shadyside*, Civil Action No. 07-807, like the instant case, resulted from this Court's severance order of April 24, 2007. *Fowler v. UPMC Shadyside*, 578 F.3d 203, 206 (3d Cir. 2009).

[4] The Court points this out because Chedwick's ability (or inability) to act as a class representative in this action largely depends on the extent to which his claims are similar to those of the other potential class members. Nevertheless, it has not gone unnoticed that UPMC wrongfully claimed, during the course of an earlier discovery dispute, that Chedwick's claims concern only matters relating to events occurring on or after October 20, 2005. ECF No. 62-11 at 3-31. It is difficult to fathom how UPMC could have misconstrued this Court's unambiguous pronouncement of December 12, 2007, that Chedwick could challenge his discharge under the Rehabilitation Act, provided that he was proceeding on a "failure-to-transfer" theory. *Chedwick v. UPMC*, 619 F.Supp.2d 172, 181-187 (W.D.Pa. 2007). The Court's opinion clearly contemplated that discovery concerning the circumstances of Chedwick's discharge would take place. *Chedwick*, 619 F.Supp.2d at 187, n. 9. Although the Court's order purported to *deny* UPMC's motion to dismiss only with respect to Chedwick's "failure-to-hire" claims, it *granted* the motion only with respect to the *ADA claims* stemming from Chedwick's discharge. *Id.* at 190. The order dismissed *none* of Chedwick's Rehabilitation Act claims, and the opinion clearly explained that Chedwick could challenge his discharge under the Rehabilitation Act. *Id.* at 181-187, 190. UPMC had no legitimate basis for resisting Chedwick's efforts to obtain information about the manner in which his employment was terminated. ECF No. 19 at 2-3; ECF No. 62-11 at 3-31. While the Court left the door open for UPMC to reassert its statute-of-limitations defense if *discovery revealed* that Chedwick's discharge would have been actionable under the pre-1992 version of the Rehabilitation Act, it did not provide UPMC with a license to obstruct the discovery process itself. *Chedwick*, 619 F.Supp.2d at 187, n. 9.

sufficient "unifying or limiting criteria" to make individualized inquiries unnecessary. *Id.* at 189 ("The class, as defined, contains no unifying or limiting criteria—with respect to employment positions held or desired, for instance, or conditions suffered, or accommodations sought—that potentially would permit classwide evaluation of whether each member of the class is "qualified" and thus can perform the essential functions of a given job with or without reasonable accommodation."). When UPMC moved for partial summary judgment on the ground that *Hohider* had rendered Chedwick incapable of pursuing class certification in this case, the Court determined that Chedwick should be afforded the opportunity to pursue class certification within the parameters outlined in that decision. *Chedwick*, 263 F.R.D. at 276.

**B.    The Improper "Use" Theory**

Chedwick now appears to concede that he cannot identify the "unifying or limiting criteria" necessary to obtain class certification under *Hohider*. Expressing an intent to pursue his "discrimination" claims "on an individual basis," he seeks to certify a class "for the sole purpose" of proceeding under 42 U.S.C. § 12112(d), which governs the permissible scope and use of medical examinations and inquiries under the ADA. ECF No. 58 at 2. Chedwick contends that UPMC's policies result in the "improper use of medical examinations and inquiries," and that this "improper use" caused him and other potential class members to lose their jobs. ECF No. 58 at 2.

Before considering whether class certification is appropriate, the Court must briefly review the UPMC policies at issue. UPMC maintains a policy providing for the automatic termination of any employee who remains on leave for more than twenty-six weeks during the course of a given twelve-month period. ECF No. 58-1 at 1, 15, 27, 37, 49, 59, 71. An employee who is unable to return to his or her previous position but nevertheless wishes to remain employed by UPMC can obtain an alternative position only by submitting a formal application. ECF No. 58-2 at 22-23; Croushore Dep. at 122-123. Larimore's letter of July 2, 2004, constitutes direct evidence that Chedwick was discharged pursuant to this policy. ECF No. 62-9 at 2.

UPMC also has a Return to Work ("RTW") Assistance Program designed to assist an employee who is able to return to work in some capacity but temporarily unable to perform all of his or her previous duties. ECF No. 58-1 at 10, 23, 33, 45, 55, 67, 77. An employee who wishes to participate in the RTW program must provide medical documentation from a treating

physician detailing his or her functional limitations. ECF No. 58-1 at 10, 23, 34, 45, 56, 67, 77. A returning employee who is able to perform the "essential functions" of his or her previous position "with appropriate modifications" is eligible to participate in the program. *Id.* If an employee cannot immediately return to his or her previous position, he or she may participate in the program by accepting a temporary assignment that is consistent with his or her abilities and limitations. *Id.* In either case, a participating employee must be able to work at least 50% of his or her previously-scheduled hours. *Id.* Participation in the RTW program is limited to twenty-six weeks, at which point an employee who "has not found a regular position at UPMC" will be terminated. ECF No. 58-1 at 11, 24, 34, 46, 56, 68. Linda Croushore ("Croushore"), UPMC's Supervisor of Disability Services, testified on August 11, 2010, that the twenty-six week limitations period applicable to an employee's participation in the RTW program begins on the date that he or she returns to work. ECF No. 58-2 at 15; Croushore Dep. at 66. In other words, an employee who has already been on leave for a full twenty-six weeks may participate in the RTW program for an additional twenty-six weeks. *Id.*

An employee seeking a new position at UPMC must submit a formal application regardless of whether he or she is participating in the RTW program. Croushore testified that a returning employee who was performing the duties of a temporary assignment in connection with the RTW program would need to apply for the position if he or she wanted to retain it for more than twenty-six weeks. ECF No. 58-2 at 17; Croushore Dep. at 107. Croushore further explained that such an employee would be in competition with other applicants in his or her attempt to secure the position. ECF No. 58-2 at 18; Croushore Dep. at 108. Since UPMC's policy provides for the termination of any RTW program participant who fails to attain a "regular position" after the expiration of the twenty-six week period, an unsuccessful applicant performing the duties of a temporary assignment would ordinarily be terminated after twenty-six weeks.[5] ECF No. 58-1 at 11, 24, 34, 46, 56, 68, 78.

Chedwick argues that UPMC's policy providing for the automatic termination of any employee who has been on leave for more than twenty-six weeks, or who has participated in the RTW program for twenty-six weeks without securing a permanent position, is violative of the

_____

[5] The most recent "UPMC Policy and Procedure Manual" contained in the record, which became effective on October 19, 2009, provides that a participating employee who fails to secure a "regular position" after the expiration of the twenty-six week period will be terminated "absent exceptional circumstances and consistent with applicable state and federal regulations." ECF No. 58-1 at 11. This qualifying language did not appear in the earlier versions of the "UPMC Policy and Procedure Manual." ECF No. 58-1 at 24, 34, 46, 56, 68, 78.

ADA pursuant to the decision of the United States Court of Appeals for the Third Circuit in *Shapiro v. Township of Lakewood*, 292 F.3d 356 (3d Cir. 2002). ECF No. 58 at 3-7. UPMC disputes Chedwick's argument and contends that its policy conforms to the ADA and the holding in *Shapiro*. ECF No. 62 at 36-42. That issue need not be resolved at this time, since the only question presently before the Court is whether the matter should be adjudicated within the context of a class action. *Eisen*, 417 U.S. at 177 ("We find nothing in either the language or history of Rule 23 that gives a court any authority to conduct a preliminary inquiry into the merits of a suit in order to determine whether it may be maintained as a class action."). The inquiry as to whether class certification is appropriate in this case centers on the extent to which UPMC's policies result in the improper use of medical examinations and inquiries. ECF No. 58 at 2.

Croushore testified that her "Work Partners" office typically assists RTW program participants in their efforts to obtain permanent positions by discussing their abilities and limitations with managers who are seeking to fill vacancies throughout UPMC's various business units. ECF No. 58-2 at 10-11; Croushore Dep. at 57-58. She stated that Work Partners personnel would sometimes try to assure a manager that a returning employee's limitations would not preclude the performance of tasks required under a particular job description. *Id.* Chedwick contends that this form of "assistance" results in the impermissible use of medical information to deny employment opportunities to disabled applicants. ECF No. 58 at 3.

The provisions of the ADA governing medical examinations and inquiries are set forth in § 12112(d), which provides:

> **(d) Medical examinations and inquiries.**
> (1) In general. The prohibition against discrimination as referred to in subsection (a) shall include medical examinations and inquiries.
> (2) Preemployment.
>> (A) Prohibited examination or inquiry. Except as provided in paragraph (3), a covered entity shall not conduct a medical examination or make inquiries of a job applicant as to whether such applicant is an individual with a disability or as to the nature or severity of such disability.
>> (B) Acceptable inquiry. A covered entity may make preemployment inquiries into the ability of an applicant to perform job-related functions.
> (3) Employment entrance examination. A covered entity may require a medical examination after an offer of employment has been made to a job applicant and prior to the commencement of the employment duties of such applicant, and may condition an offer of employment on the results of such examination, if—

(A) all entering employees are subjected to such an examination regardless of disability;

(B) information obtained regarding the medical condition or history of the applicant is collected and maintained on separate forms and in separate medical files and is treated as a confidential medical record, except that—

(i) supervisors and managers may be informed regarding necessary restrictions on the work or duties of the employee and necessary accommodations;

(ii) first aid and safety personnel may be informed, when appropriate, if the disability might require emergency treatment; and

(iii) government officials investigating compliance with this Act shall be provided relevant information on request; and

(C) the results of such examination are used only in accordance with this title.

(4) Examination and inquiry.

(A) Prohibited examinations and inquiries. A covered entity shall not require a medical examination and shall not make inquiries of an employee as to whether such employee is an individual with a disability or as to the nature or severity of the disability, unless such examination or inquiry is shown to be job-related and consistent with business necessity.

(B) Acceptable examinations and inquiries. A covered entity may conduct voluntary medical examinations, including voluntary medical histories, which are part of an employee health program available to employees at that work site. A covered entity may make inquiries into the ability of an employee to perform job-related functions.

(C) Requirement. Information obtained under subparagraph (B) regarding the medical condition or history of any employee are subject to the requirements of subparagraphs (B) and (C) of paragraph (3).

42 U.S.C. § 12112(d). The ADA's requirements concerning medical examinations and inquiries are incorporated within the Rehabilitation Act by reference. 29 U.S.C. § 794(d); *Lee v. City of Columbus*, ___F.3d___, ___, 2011 WL 611904, at *5, 2011 U.S. App. LEXIS 3508, at *16 (6th Cir. 2011); *Doe v. United States Postal Service*, 317 F.3d 339, 340 (D.C. Cir. 2003); *Scott v. Napolitano*, 717 F.Supp.2d 1071, 1082, n. 4 (S.D.Cal. 2010). Chedwick intimates that UPMC's refusal to rehire him on or after October 20, 2005, was somehow attributable to the improper use of information pertaining to his medical condition. ECF No. 58 at 3-5.

The plain language of the ADA proscribes the discriminatory use of medical examinations and inquires. 42 U.S.C. § 12112(d)(1), (3)(A). A policy requiring only disabled individuals to undergo medical examinations or respond to medical inquiries would clearly violate this statutory proscription. *Harrison v. Benchmark Electronics Huntsville, Inc.*, 593 F.3d

1206, 1213 (11th Cir. 2010)(explaining that § 12112(d)(1) incorporates § 12112(a)'s general ban on disability-based discrimination). The remaining provisions of the ADA concerning medical examinations and inquiries relate to three different stages of an employer's relationship with an applicant or employee. Before an offer of employment is made, an employer may not ask a job applicant to undergo a medical examination or inquire as to whether he or she is disabled. 42 U.S.C. § 12112(d)(2)(A). This prohibition is designed "to curtail all questioning" that would identify individuals with disabilities and exclude them from further consideration for employment. *Griffin v. Steeltek, Inc.*, 160 F.3d 591, 594 (10th Cir. 1998). Once an offer of employment has been made, a prospective employee may be asked to undergo a medical examination, provided that "all entering employees are subjected to such an examination regardless of disability," the confidentiality requirements of § 12112(d)(3)(B) are adhered to, and the results of the examination are "used only in accordance with" Title I. 42 U.S.C. § 12112(d)(3). An "[e]mployment entrance examination" of this kind does not have to be "job-related" or "consistent with business necessity." 29 C.F.R. § 1630.14(b)(3). After an employee's duties have commenced, an employer may not ask him or her to undergo a medical examination or inquire as to whether he or she is disabled "unless such examination or inquiry is shown to be job-related and consistent with business necessity." 42 U.S.C. § 12112(d)(4)(A). The primary purpose of this restriction is to prevent covered employers from using unjustified medical examinations and inquiries to discover or expose medical information that could stigmatize disabled employees. *Brownfield v. City of Yakima*, 612 F.3d 1140, 1146 (9th Cir. 2010). The propriety of a medical examination or inquiry under § 12112(d)(4)(A) is determined pursuant to an objective standard rather than by reference to an employer's subjective point of view. *Tice v. Centre Area Transportation Authority*, 247 F.3d 506, 518 (3d Cir. 2001). An employee may be subjected to a medical examination or inquiry when a physical or mental impairment adversely affects his or her job performance. *Yin v. California*, 95 F.3d 864, 686 (9th Cir. 1996). An employer remains free to inquire as to the ability of an applicant or employee "to perform job-related functions" at all times. 42 U.S.C. § 12112(d)(2)(B), (4)(B).

Chedwick argues that class certification in this case is not impeded by *Hohider* because a plaintiff asserting a claim under § 12112(d) is not required to show that he or she is "qualified" or "disabled" within the meaning of the ADA. ECF No. 58 at 2. This contention "simply paints with too broad of a brush." *Chedwick*, 263 F.R.D. at 276. The question of whether a plaintiff

seeking to proceed under § 12112(d) must demonstrate that he or she is "qualified" or "disabled" depends on the precise nature of the claim being asserted.

Unlike § 12112(a), which prohibits only discrimination "against a qualified individual on the basis of disability," § 12112(d) contains no language limiting the category of applicants and employees entitled to statutory protection. 42 U.S.C. § 12112(a), (d); *Fredenburg v. Contra Costa County Dept. of Health Services*, 172 F.3d 1176, 1182 (9th Cir. 1999). An applicant or employee who is subjected to an unlawful medical examination or inquiry need not show that he or she is "disabled" in order to maintain an action under § 12112(d). *Fredenburg*, 172 F.3d at 1182. Instead, such an employee can prevail by demonstrating that he or she suffered harm as a result of the examination or inquiry. For instance, a job applicant who is rejected by an employer on the basis of an illegal pre-offer examination or inquiry may proceed with a claim under § 12112(d)(2)(A) regardless of whether he or she is "disabled." *Griffin*, 160 F.3d at 592-595. In the same vein, an employee need not be "disabled" in order to challenge the propriety or scope of a medical examination or inquiry under § 12112(d)(4)(4). *Conroy v. New York State Dept. of Correctional Services*, 333 F.3d 88, 94-95 (2d Cir. 2003); *Roe v. Cheyenne Mountain Conference Resort, Inc.*, 124 F.3d 1221, 1229 (10th Cir. 1997). Similarly, harm to an employee resulting from an employer's wrongful disclosure of confidential medical information is actionable under § 12112(d)(3)(B) or (4)(C) irrespective of whether the employee suffers from a "disability." *Cossette v. Minnesota Power & Light*, 188 F.3d 964, 969 (8th Cir. 1999); *EEOC v. Ford Motor Credit Co.*, 531 F.Supp.2d 930, 936-943 (M.D.Tenn. 2008).

In contrast to claims involving improper medical examinations, unjustified medical inquiries or unauthorized disclosures of confidential medical information, there are claims under § 12112(d) which depend on whether applicants or employees are "qualified" or "disabled" within the meaning of the ADA. For example, § 12112(d)(3)(C) provides that the results of an "[e]mployment entrance examination" may only be used "in accordance with" Title I. 42 U.S.C. § 12112(d)(3)(C). A covered entity engages in prohibited "discrimination" when it rejects a prospective employee on the basis of "qualification standards, employment tests or other selection criteria that screen out or tend to screen out an individual with a disability or a class of individuals with disabilities unless the standard, test or other selection criteria, as used by the covered entity, is shown to be job-related for the position in question and is consistent with business necessity." 42 U.S.C. § 12112(b)(6). Consequently, an employer may not rely on the

results of a lawful medical examination to deny employment to an individual unless the examination reveals that a physical or mental impairment suffered by the individual precludes him or her from performing the "essential functions" of the desired position. *Holiday v. City of Chattanooga*, 206 F.3d 637, 640-648 (6th Cir. 2000). If a physical or mental examination reveals that a prospective employee suffers from an impairment that could *potentially* preclude the performance of "essential" work-related tasks, an employer may reject that prospective employee only on the basis of an "individualized determination" that the impairment will *actually* preclude the performance of those tasks. *Id.* at 644, citing *Taylor v. Pathmark Stores, Inc.*, 177 F.3d 180, 193 (3d Cir. 1999). An employer which rejects a disabled applicant pursuant to a belief that his or her impairment will render him or her incapable of performing "essential" job duties runs the risk of being wrong and incurring liability. *Taylor*, 177 F.3d at 193 ("If an employer believes that a perceived disability inherently precludes successful performance of the essential functions of a job, with or without accommodation, the employer must be correct about the affected employee's ability to perform the job in order to avoid liability; there is no defense of reasonable mistake."). In this situation, an individual must show that he or she is "qualified" for the relevant position in order to establish that the results of a medical examination were improperly "used" to facilitate discrimination.[6] *Holiday*, 206 F.3d at 645.

Like medical information obtained during the course of an "[e]mployment entrance examination," information "regarding the medical condition or history of any employee" obtained by means of a "voluntary medical examination" or an inquiry as to his or her "ability to perform job-related functions" may be "used only in accordance with" Title I. 42 U.S.C. § 12112(d)(3)(C), (4)(B)-(C). A careful reading of Chedwick's brief reveals that he is basing his motion for class certification on an allegation that UPMC improperly "uses" medical information obtained from disabled employees to deprive them of alternative employment opportunities. ECF No. 58 at 5-10. He attempts to rely on § 12112(d) in order to circumvent the holding in *Hohider*. In support of his position, Chedwick calls the Court's attention to *Garrison v. Baker Hughes Oilfield Operations, Inc.*, 287 F.3d 955 (10th Cir. 2002), and *O'Neal v. City of New*

---

[6] It is not clear whether UPMC requires some or all of its incoming employees to undergo medical examinations prior to the commencement of their duties. Although Chedwick refers only to medical "inquiries" to support his argument, his proposed class would presumably include employees who have been discharged because of UPMC's alleged misuse of medical information obtained during the course of post-offer medical examinations (if such examinations are required under UPMC's internal policies). ECF No. 58 at 2 (stating that "UPMC's policy results in an improper use of medical examinations and inquiries").

*Albany*, 293 F.3d 998 (7th Cir. 2002).  ECF No. 58 at 8-9.  Those decisions, however, do not support Chedwick's argument.

In *Garrison*, the United States Court of Appeals for the Tenth Circuit recognized that § 12112(d)(3)(C) restricts the ways in which an employer may "use" the results of a permissible medical examination or inquiry to withdraw an offer of employment.  *Garrison*, 287 F.3d at 963, n. 7 (citing § 12112(d)(3)(C) for the proposition that "[e]mployers may only withdraw job offers for reasons 'in accordance' with subchapter I of the Americans with Disabilities Act").  Nonetheless, the Court of Appeals also explained that while a plaintiff is *generally* not required to show that he or she is "disabled" in order to challenge improper medical examinations and inquiries under the ADA, he or she cannot prevail in an improper "use" claim brought pursuant to § 12112(d)(3)(C) without establishing than an employer "used collected medical information to discriminate on the basis of a disability." *Id.* at 960, n. 4.  The United States Court of Appeals for the Seventh Circuit followed this line of reasoning in *O'Neal*, holding that an individual cannot recover under § 12112(d)(3)(C) without establishing that he or she is "disabled" within the meaning of the ADA.  *O'Neal*, 293 F.3d at 1009-1010.  These decisions are consistent with the plain language of the ADA, which provides that a covered employer "may condition an offer of employment on the results of [a medical] examination" if "the results of such examination are used only in accordance with [Title I]."  42 U.S.C. § 12112(d)(3)(C).  In order to show that the results of a lawful medical examination were improperly "used" by an employer to withdraw an offer of employment, a plaintiff must demonstrate both the existence of a statutory "disability" and his or her ability to perform the "essential functions" of the position in question, with or without reasonable accommodations.  29 C.F.R. § 1630.14(b)(3).[7]

The "use" restriction applicable to the results of an "[e]mployment entrance examination" applies with equal force to certain forms of medical information obtained by means of "voluntary medical examinations" and "job-related" medical inquiries involving a covered entity's current employees.  42 U.S.C. § 12112(d)(4)(B)-(C).  Chedwick contends that UPMC used medical

---

[7] The applicable regulation provides:

> Medical examinations conducted in accordance with this section do not have to be job-related and consistent with business necessity.  However, if certain criteria are used to screen out an employee or employees with disabilities as a result of such an examination or inquiry, the exclusionary criteria must be job-related and consistent with business necessity, and performance of the essential job functions cannot be accomplished with reasonable accommodation as required in this part.

29 C.F.R. § 1630.14(b)(3).

information related to his disability to deny him alternative employment opportunities. ECF No. 58 at 3. He apparently sought assistance from UNUM Provident personnel when he was trying to get a new job with UPMC. In an email message sent to Croushore on November 1, 2005, Perry asked whether UPMC had a "contact person" who could speak with UNUM Provident's vocational specialist about Chedwick's employment prospects. ECF No. 58-3 at 2. Perry's message indicated that Chedwick was receiving long-term disability benefits. *Id.* The next day, Croushore forwarded the message to Larimore and stated that there was "no set recruiter" for the vocational specialist to contact, and that she could not provide assistance to Chedwick. *Id.* at 1-2. Larimore forwarded the message chain to Rimer, who responded by identifying an Interface Analyst position that was consistent with Chedwick's qualifications. *Id.* at 1. Although Chedwick applied for the position, he never received an interview. ECF No. 62-8 at 8; Croushore Aff. at ¶¶ 35-36. The crux of Chedwick's argument is that UPMC declined to interview him for the position because Croushore had forwarded information to Rimer referencing his receipt of long-term disability benefits. ECF No. 58 at 3-7.

In order to establish a violation of § 12112(d)(4)(C), Chedwick would need to show that UPMC "used" information pertaining to his medical condition in a manner that was not "in accordance with" Title I. 42 U.S.C. § 12112(d)(3)(C), (4)(C). He could do so only by demonstrating that he was both "disabled" within the meaning of the ADA and "qualified" for the Interface Analyst position. *Taylor v. Phoenixville School District*, 184 F.3d 296, 306 (3d Cir. 1999). Chedwick does not allege that he was subjected to an improper medical examination or inquiry that could be actionable under the ADA without regard to his individual status. A freestanding "examination" or "inquiry" claim under § 12112(d) accrues as soon as a covered employer "conducts an improper medical examination or asks an improper disability-related question, regardless of the results or response." *Green v. Joy Cone Co.*, 107 Fed. Appx. 278, 280 (3d Cir. 2004). In contrast, an improper "use" claim does not accrue until an employer *uses* lawfully-obtained medical information to discriminate in a manner that violates § 12112(a). *Garrison*, 287 F.3d at 960, n. 4. The viability of Chedwick's improper "use" claim would depend on questions such as whether he was "disabled" within the meaning of the ADA, whether he was "qualified" for the position in question, and whether there was a causal connection between his status as a "disabled" individual and UPMC's refusal to rehire him. *O'Neal*, 293 F.3d at 1009-1010; *Holiday*, 206 F.3d at 645.

**C.    The Application of Rule 23**

Chedwick maintains that he can satisfy the requirements of subsections (a), (b)(2) and (b)(3) of Rule 23.  ECF No. 58 at 10-19.  UPMC attacks Chedwick's motion for class certification from several different angles.  UPMC's first argument is that Chedwick cannot pursue a claim under § 12112(d) because he failed to exhaust it before the EEOC and never included it in his complaint.  ECF No. 62 at 24-26.  With respect to the issue of exhaustion, the Court notes that Chedwick's claims are based on both the ADA and the Rehabilitation Act.  ECF No. 1 at ¶¶ 1-2.  The Rehabilitation Act incorporates the provisions of the ADA governing medical examinations and inquiries.  29 U.S.C. § 794(d); *Lee*, ___F.3d at___, 2011 WL 611904, at *5, 2011 U.S. App. LEXIS 3508, at *16; *Doe*, 317 F.3d at 340; *Scott*, 717 F.Supp.2d at 1082, n. 4.  Chedwick was not required to exhaust his Rehabilitation Act claims before commencing this action.  *Freed v. Consolidated Rail Corp.*, 201 F.3d 188, 192-194 (3d Cir. 2000).  Thus, UPMC's argument concerning exhaustion, if meritorious, would defeat only Chedwick's claim arising directly under § 12112(d)(4)(C), and would not impact his parallel claim under the Rehabilitation Act.  *Hopkins v. City of Wilmington*, 629 F.Supp.2d 392, 396 (D.Del. 2009)(explaining that a plaintiff need not exhaust a claim under the Rehabilitation Act even if he or she "also has a viable claim under the ADA, a statute that does require exhaustion of administrative remedies").  In addition, Chedwick's improper "use" claims are wholly dependent on underlying violations of § 12112(a) and, therefore, arguably the *same* claims asserted in his complaint.  *Holiday*, 206 F.3d at 640-648 (analyzing a claim involving the alleged misuse of medical information to withdraw a job offer as a typical "failure-to-hire" claim, even though the medical information had been obtained during the course of a medical examination).  In any event, there is no need for the Court to consider these issues, since Chedwick cannot satisfy the requirements of Rule 23 even if it is assumed that he can pursue individual claims stemming from UPMC's alleged misuse of his medical information.

Chedwick did not participate in the RTW program.  ECF No. 62-8 at 6; Croushore Aff. at ¶ 25.  UPMC contends that Chedwick's status as a nonparticipant deprives him of standing to pursue a claim under § 12112(d).  ECF No. 62 at 27-28.  This argument fails to account for Chedwick's assertion that *his* medical information was improperly used to deny him the Interface Analyst position.  ECF No. 58 at 3-7.  There is no need for the Court to determine whether UPMC actually violated the ADA or the Rehabilitation Act with respect to Chedwick,

since the inquiry concerning standing does not depend on whether UPMC's conduct was legal.[8] *Tandy v. City of Wichita*, 380 F.3d 1277, 1283, n. 10 (10th Cir. 2004). While the factors distinguishing Chedwick's situation from the factual scenarios involving other potential class members are certainly relevant to the Court's analysis under Rule 23, they do not defeat Chedwick's standing to vindicate his own rights in this case.

UPMC argues that Chedwick cannot meet the requirements of Rule 23. ECF No. 62 at 30-53. Chedwick implicitly concedes that his evidentiary submissions are not sufficient to warrant class certification by suggesting that further discovery is necessary to facilitate the adjudication of his motion. ECF No. 58 at 1. The Court notes that a class cannot be certified unless each relevant component of Rule 23 is satisfied. *In re: Constar International, Inc., Securities Litigation*, 585 F.3d 774, 780 (3d Cir. 2009). Chedwick bears the burden of *proving* each factual prerequisite to class certification by a preponderance of the evidence. *Hydrogen Peroxide*, 552 F.3d at 307. Some degree of discovery is obviously necessary to enable a plaintiff seeking class certification to meet his or her evidentiary burden. Nevertheless, the evidence presently before the Court indicates that this case cannot be maintained as a class action, and that additional discovery concerning the issue of class certification would be futile.

The record contains a list of forty-seven former employees of UMPC's corporate unit who were terminated after having been on leave for more than twenty-six weeks. ECF No. 58-4. Chedwick contends that discovery involving UPMC's other business units would identify hundreds or thousands of other potential class members. ECF No. 58 at 12-13. Accordingly, the Court assumes *arguendo* that Chedwick can satisfy Rule 23(a)(1)'s numerosity requirement. *Stewart v. Abraham*, 275 F.3d 220, 226-227 (3d Cir. 2001)(observing that "the first prong of Rule 23(a)" is generally met when the proposed class representative demonstrates that the number of class members exceeds forty). Chedwick need only share "one question of fact or law with the grievances of the prospective class" to surmount Rule 23(a)(2)'s commonality

---

[8] UPMC argues that there is no "factual basis" for Chedwick's allegation that the results of medical inquiries are used to discriminate against disabled employees who participate in the RTW program. ECF No. 62 at 29-30. In an affidavit dated December 28, 2010, Croushore declared that her Work Partners office does not reveal confidential medical information about returning employees to recruiters working throughout UPMC's business units. ECF No. 62-8 at 5; Croushore Aff. at ¶¶ 19-21. The Court has no occasion to consider the legality of UPMC's policies and practices relating to the RTW program. *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 177, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974)("We find nothing in either the language or history of Rule 23 that gives a court any authority to conduct a preliminary inquiry into the merits of a suit in order to determine whether it may be maintained as a class action.").

prerequisite.[9] *Baby Neal v. Casey*, 43 F.3d 48, 56 (3d Cir. 1994). Since the claims asserted by all potential class members would relate to whether UPMC's automatic-termination policy violates the ADA and the Rehabilitation Act, Chedwick can presumably satisfy the commonality requirement. ECF No. 57 at ¶ 3.

In order to satisfy Rule 23(a)(3)'s typicality requirement, Chedwick must show that his claims are "typical" of the claims asserted by the other potential class members. FED. R. CIV. P. 23(a)(3). The United States Court of Appeals for the Third Circuit recently articulated the elements of a proper "typicality" analysis by stating as follows:

> [W]e glean the proper consideration in assessing typicality to include three distinct, though related, concerns: (1) the claims of the class representative must be generally the same as those of the class in terms of both (a) the legal theory advanced and (b) the factual circumstances underlying that theory; (2) the class representative must not be subject to a defense that is both inapplicable to many members of the class and likely to become a major focus of the litigation; and (3) the interests and incentives of the representative must be sufficiently aligned with those of the class.

*In re: Schering Plough Corp. ERISA Litigation*, 589 F.3d 585, 599 (3d Cir. 2009). A careful review of the parties' filings reveals that Chedwick cannot satisfy this standard.

While Chedwick's improper "use" claims under § 12112(d)(4)(C) would most likely proceed pursuant to the same "legal theory" as the claims asserted by other class members, the "factual circumstances underlying" Chedwick's claims would be materially different from those underlying the claims of the RTW program participants. Chedwick never participated in the RTW program. ECF No. 62-8 at 6; Croushore Aff. at ¶ 25. The primary basis for his motion for class certification is the alleged misuse of returning employees' medical information by Work Partners personnel in connection with that program. ECF No. 58 at 3. In an affidavit dated December 28, 2010, Croushore stated that she had not been involved with Chedwick's attempt to secure alternative employment during the fall of 2005 because he had never participated in the RTW program and had already been terminated by UPMC. ECF No. 62-8 at 8; Croushore Aff. at ¶ 34. Croushore's declaration is consistent with her November 2, 2005, email message to Larimore, in which she stated that she could not provide assistance to Chedwick. ECF No. 58-3.

---

[9] Although Rule 23(a)(2) refers to "*questions* of law or fact common to the class," the plural form of the word "question" has not been construed to require more than one common question in order for a finding of commonality to be sustained. FED. R. CIV. P. 23(a)(2)(emphasis added); *In re: Schering Plough Corp. ERISA Litigation*, 589 F.3d 585, 597, n. 10 (3d Cir. 2009).

Chedwick moves for the certification of a class consisting of "all former employees of UPMC for all business units from 2004 through the present who were on a medical leave of absence and automatically terminated after twenty-six weeks." ECF No. 57 at ¶ 3. The proposed class definition would identify class members by reference to the manner in which they were *terminated*. Chedwick apparently wants to prove that UPMC misuses information relating to the medical conditions of returning employees that is provided to recruiters by Work Partners personnel charged with implementing the RTW program. ECF No. 58 at 3-7. Chedwick's individual "use" claim, however, concerns the manner in which medical information was used to reject his applications for employment on or after October 20, 2005. ECF No. 58 at 3. The Court has already pointed out that Chedwick's "failure-to-hire" claims are separate and distinct from his wrongful discharge claims. *Chedwick*, 619 F.Supp.2d at 178-181. Chedwick's status as a *former* (and *prospective*) UPMC employee in October 2005 was materially different from the status of individuals who were trying to *remain* UPMC employees by utilizing the RTW program. A disabled employee attempting to return from leave must find a "transitional" work assignment in order to avoid termination after the passage of twenty-six weeks, whereas an applicant for future employment is not directly affected by the automatic-termination policy. ECF No. 58-1 at 11, 23, 34, 45, 56, 67, 77. It is difficult to understand how Chedwick believes that he can represent a class of persons whose medical information was improperly "used" to effectuate their termination based on the improper "use" of his medical information *subsequent* to his own termination.[10]

There is another factor which weighs against a "typicality" finding in this case. Chedwick objects to the fact that he was identified as a former employee receiving long-term disability benefits when Perry's message to Croushore was forwarded to Larimore and Rimer. ECF No. 58 at 3-7; ECF No. 58-3. The provisions of the ADA governing the use of employees' medical information pertain only to information received as a result of specified "medical

---

[10] Some decisions applying the ADA and the Rehabilitation Act have recognized similarities between a current employee trying to return from a medical leave and a former employee seeking to be rehired. *Harris v. Harris & Hart*, 206 F.3d 838, 839-845 (9th Cir. 2000); *Grenier v. Cyanamid Plastics, Inc.*, 70 F.3d 667, 668-678 (1st Cir. 1995). The merits of Chedwick's claims, however, are not presently at issue. The only motion before the Court is Chedwick's motion for class certification. Although Chedwick's proposed class definition would identify class members by reference to the circumstances surrounding their *termination*, his own improper "use" claims relate to UPMC's refusal to rehire him rather than to the reasons for his discharge. ECF No. 57 at ¶ 3; ECF No. 58 at 3. There is simply no logical relationship between UPMC's alleged misuse of Chedwick's medical information and the automatic-termination policy referenced in the proposed class definition.

examinations" and "inquiries."  42 U.S.C. § 12112(d)(3)(C), (4)(B)-(C).  They generally do not apply to information that is voluntarily disclosed by an employee.  *Cash v. Smith*, 231 F.3d 1301, 1307-1308 (11th Cir. 2000).  While the Court expresses no opinion concerning the viability of Chedwick's improper "use" theory, UPMC may argue that the information supplied by Perry (who apparently acted at Chedwick's behest) was beyond the purview of § 12112(d)(4)(C) because it was not provided in response to an "inquiry" made by UPMC.  *Doe*, 317 F.3d at 343-345.  Although such an argument would not be sufficient to derail Chedwick's more generalized "failure-to-hire" claims under § 12112(a), it could potentially destroy the premise for his argument that UPMC violated his rights under § 12112(d).  Given that Chedwick never participated in the RTW program, Croushore's testimony concerning the usual communications between Work Partners personnel and recruiters seeking to fill vacancies throughout UPMC's various business units cannot give rise to an inference that *his* medical information was received and misused by a recruiter.  ECF No. 58-2 at 10-15; Croushore Dep. at 57-62.  Since the information forwarded to Rimer was arguably *not* subject to the requirements of § 12112(d), Chedwick's individual claim may "be subject to a defense that is both inapplicable to many members of the [proposed] class and likely to become a major focus of [this] litigation." *Schering Plough*, 589 F.3d at 599.  For these reasons, Chedwick cannot satisfy Rule 23(a)(3)'s "typicality" prerequisite to class certification.

The "adequacy" inquiry required under Rule 23(a)(4) accounts for both the ability of the class representative's counsel to "fairly and adequately protect the interests of the [proposed] class" and any potential "conflicts of interest" between the named party and the class that he or she seeks to represent.  *In re: Warfarin Sodium Antitrust Litigation*, 391 F.3d 516, 532 (3d Cir. 2004).  The Court has no doubt that the attorneys retained by Chedwick are competent to handle a class action.  FED. R. CIV. P. 23(g).  The unique nature of Chedwick's claim, however, renders him an inadequate class representative under these circumstances.  Vulnerabilities in the individual claims asserted by a proposed class representative are relevant to the "adequacy" inquiry as well as the "typicality" inquiry.  *Beck v. Maximus, Inc.*, 457 F.3d 291, 296 (3d Cir. 2006).  Since UPMC may be able to attack Chedwick's improper "use" claim on the ground that his medical information was not provided in response to an "inquiry," there is a danger that Chedwick "will become distracted by the presence of a possible defense applicable only to him," and that the interests of the other class members will suffer.  *J.H. Cohn & Co. v. American*

*Appraisal Associates, Inc.*, 628 F.2d 994, 999 (7ᵗʰ Cir. 1980). Because Chedwick cannot fulfill the applicable "typicality" and "adequacy" prerequisites, his motion for class certification must be denied regardless of whether he could otherwise satisfy the requirements of either subsection (b)(2) or subsection (b)(3).[11]

Even if Chedwick could surmount the "typicality" and "adequacy" hurdles under Rule 23(a), he would not be able to establish his entitlement to certification under Rule 23(b)(2). As noted earlier, an individual's ability to succeed in an improper "use" claim under § 12112(d)(3)(C) or (4)(C) generally depends on whether he or she can succeed on an underlying "discrimination" claim under § 12112(a). *O'Neal*, 293 F.3d at 1009-1010; *Garrison*, 287 F.3d at 960, n. 4. A plaintiff pursuing this type of claim must ordinarily show that lawfully-obtained medical information (*i.e.*, evidence of a medical condition obtained as a result of a lawful medical examination or a permissible medical inquiry) was unlawfully used by an employer to deny him or her a position for which he or she was nevertheless "qualified." *Holiday*, 206 F.3d at 640-648. In this respect, an inquiry into whether the individual plaintiff was "qualified" for the desired position would be necessary to facilitate a determination as to whether disability-based "discrimination against that individual, once proven to have occurred, [was] unlawful" under the ADA and the Rehabilitation Act. *Hohider*, 574 F.3d at 191. A returning employee participating in the RTW program would need to establish both the *existence* of a vacant position and his or her own *qualifications* for the position in order to show that UPMC improperly "used" medical information to reject his or her application for that position. *Donahue v. Consolidated Rail Corp.*, 224 F.3d 226, 230 (3d Cir. 2000). Only a "qualified" applicant or employee would be able to establish an actionable violation of the ADA or the Rehabilitation Act. *Hohider*, 574 F.3d at 192 (explaining that the ADA "generally requires evaluation of whether a disabled individual is 'qualified' as defined under the statute to determine not only whether discrimination on the basis of disability has occurred, but more fundamentally, whether such discrimination against that individual is unlawful"). An applicant or employee whose disability could not have been accommodated in any event would not be able to succeed in an improper "use" claim, whereas a "qualified" applicant or employee could prevail by demonstrating that UPMC wrongfully relied on medical information to deny him or her a position that was consistent with his or her abilities and limitations. *Mengine v. Runyon*, 114 F.3d 415, 420 (3d Cir.

---

[11] Chedwick does not rely on subsection (b)(1) as a basis for seeking class certification. ECF No. 58 at 19.

1997)(remarking that "if reasonable accommodation is impossible, nothing more than communication to the employee of this fact is required"); *Willis v. Conopco*, 108 F.3d 282, 285 (11th Cir. 1997)(observing that the ADA "is not intended to punish employers for behaving callously if, in fact, no accommodation for the employee's disability could reasonably have been made"). Since the lawfulness (or unlawfulness) of UPMC's actions with respect to each potential class member would turn on factual characteristics and circumstances unique to each individual, Chedwick cannot show that UPMC "has acted or refused to act on grounds that apply generally to the class," or that "final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole."[12] FED. R. CIV. P. 23(b)(2).

In order to demonstrate that class certification is proper under Rule 23(b)(3), Chedwick would need to show that "the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." FED. R. CIV. P. 23(b)(3). Certification under Rule 23(b)(3) is improper whenever the "essential elements" of the plaintiffs' claims require individualized treatment. *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 172 (3d Cir. 2001). Therefore, the propriety of class certification in this case can only be determined by reference to what the individual class members would have to prove in order to hold UPMC liable under the ADA or the Rehabilitation Act. *Hydrogen Peroxide*, 552 F.3d at 311. The decision in *Hohider* was premised on the fact that individualized assessments would be required to determine whether each member of the class was "qualified" for his or her position. *Hohider*, 574 F.3d at 185-186. As the Court has already explained, the reasoning employed in *Hohider* would apply with equal force to improper "use" claims of the kind discussed in Chedwick's brief. ECF No. 58 at 3-10; *O'Neal*, 293 F.3d at 1009-1010; *Garrison*, 287 F.3d at 960, n. 4. Consequently, Chedwick cannot satisfy the requirements of Rule 23(b)(3).

Class certification would be improper in this case for the additional reason that Chedwick cannot show that each member of the proposed class was "disabled" within the meaning of the ADA and the Rehabilitation Act at the time of his or her discharge. *O'Neal*, 293 F.3d at 1010

---

[12] Chedwick cannot satisfy the requirements of Rule 23(b)(2) simply by demonstrating that all members of the proposed class were discharged pursuant to UPMC's automatic-termination policy. *Purdue v. Murphy*, 915 N.E.2d 498, 507 (Ind.Ct.App. 2009)(stating that Rule 23(b)(2) is not "relaxed enough to permit class actions when the only unifying criteria for the members of the class are that they are somehow disabled, in need of accommodation, and mutually affected by the policy sought to be enjoined").

(affirming a grant of summary judgment in favor of an employer defending a claim under § 12112(d)(3)(C) because the plaintiff was concededly not "disabled").  The determination as to whether a person is statutorily "disabled" requires a highly individualized analysis.  "[E]ven if two different plaintiffs alleging substantial limitations suffer from the same impairment, the nuances of its effect on their daily lives will invariably manifest themselves in distinct ways."  *Emory v. AstraZeneca Pharmaceuticals, LP*, 401 F.3d 174, 182 (3d Cir. 2005).  Moreover, the ADA Amendments Act of 2008, which became effective on January 1, 2009, broadened the category of individuals entitled to statutory protection from discrimination under the ADA and the Rehabilitation Act by altering the definition of the term "disability."  Pub. L. No. 110-325, §§ 4-8, 122 Stat. 3553, 3555-3559 (2008).  Several federal courts have determined that the ADA Amendments Act does not apply retroactively.  *Becerril v. Pima County Assessor's Office*, 587 F.3d 1162, 1164 (9th Cir. 2009); *Thornton v. United Parcel Service, Inc.*, 587 F.3d 27, 35, n. 3 (1st Cir. 2009); *Frederickson v. United Parcel Service Co.*, 581 F.3d 516, 521, n. 1 (7th Cir. 2009); *Lytes v. DC Water & Sewer Authority*, 572 F.3d 936, 942 (D.C. Cir. 2009); *Millholland v. Sumner County Board of Education*, 569 F.3d 562, 565 (6th Cir. 2009); *EEOC v. Agro Distribution LLC*, 555 F.3d 462, 469, n. 8 (5th Cir. 2009).  Chedwick's proposed class would include individuals who were terminated both before and after January 1, 2009.  ECF No. 57 at ¶ 3.  Thus, the inquiries into whether particular class members were entitled to statutory protection in the first place would have to be conducted under two different legal standards.  This reality further illustrates why a class cannot be certified under these circumstances.

### Conclusion

The Court acknowledges that a plaintiff can sometimes assert claims under § 12112(d) without establishing his or her "qualifications" for a particular position or the existence of a statutory "disability."  For instance, an individual whose injuries are attributable to an *unlawful* medical examination or inquiry can recover under § 12112(d) without showing that his or her employer engaged in a form of "discrimination" proscribed by § 12112(a).  *Harrison*, 593 F.3d at 1215-1216; *Griffin*, 160 F.3d at 592-595.  Likewise, an employee who is harmed by a covered entity's failure to comply with the ADA's confidentiality requirements can recover for damages resulting from an unauthorized disclosure regardless of whether he or she is "disabled."  *Doe*, 317 F.3d at 343-345.  These types of violations, however, bear no meaningful relationship to the forms of "discrimination" alleged in Chedwick's complaint or the improper "use" theory

advanced in his brief.  ECF No. 1 at ¶¶ 10-38; ECF No. 58 at 3-10.  Chedwick does not allege
that he was subjected to illegal medical examinations or inquiries, or that confidential
information pertaining to his "medical condition or history" was wrongfully disclosed.  42
U.S.C. § 12112(d)(2)(A), (3)(B), (4)(A), (C).  Instead, he claims that UPMC wrongfully "used"
information to perpetrate a form of "discrimination" prohibited by § 12112(a).  ECF No. 58 at 3-
10.  The theory relied upon by Chedwick is subject to the rule established in *Hohider*.  Since
Chedwick implicitly concedes that he can pursue his underlying "discrimination" claims only
"on an individual basis," it is apparent that further discovery involving the issue of class
certification would be futile.  ECF No. 58 at 2.

   Even if the Court were to liberally construe Chedwick's argument to mean that
Croushore and Larimore improperly disclosed his receipt of long-term disability benefits to
Rimer, thereby obviating the need for him to prove that he was "disabled" within the meaning of
the applicable statutory provisions and "qualified" for the Interface Analyst position, Chedwick
would nevertheless be an improper representative for the proposed class.  UPMC's conduct in
relation to Chedwick during the fall of 2005 would still bear no relationship to the automatic-
termination policy referenced in the proposed class definition, since Chedwick had already been
discharged by that time.  ECF No. 57 at ¶ 3.  Furthermore, UPMC could persuasively argue that
the information contained in Perry's message was not provided in response to an "inquiry" made
by UPMC.  *Doe*, 317 F.3d at 343-345; *Cash*, 231 F.3d 1307-1308.  After all, it was Perry (a
UNUM Provident employee acting on behalf of Chedwick) who disclosed the fact that Chedwick
was a former employee receiving long-term disability benefits.  ECF No. 58-3.  After receiving
Perry's email message, Croushore merely *forwarded* the message to Larimore, who proceeded to
*forward* the same message to Rimer.  *Id.*  No employee of UPMC supplied Rimer with *medical
information* that had not been voluntarily disclosed by Perry.  This fact distinguishes Chedwick
from those potential class members whose medical information was allegedly passed on to
recruiters by Work Partners personnel.  *Schering Plough*, 589 F.3d at 599 (stating that a
proposed class representative "must not be subject to a defense that is both inapplicable to many
members of the class and likely to become a major focus of the litigation").  Moreover, a breach-

of-confidentiality theory of this kind would in no way resemble the theories of "discrimination" articulated in Chedwick's complaint.[13]  ECF No. 1 at ¶¶ 10-38.

For the foregoing reasons, this case cannot be maintained as a class action.  The time has come for the parties to concentrate their efforts on the merits of Chedwick's individual claims. The Court expresses no opinion as to whether Chedwick can establish actionable violations of the ADA and the Rehabilitation Act, or as to whether UPMC's policies are in conformity with federal law.

Chedwick cannot establish his entitlement to class certification under subsections (a)(3), (a)(4), (b)(2) and (b)(3) of Fed.R.Civ.P. 23.  Accordingly, the motion for class certification (*Document No. 57*) will be denied.  An appropriate order follows.

McVerry, J.

---

[13] As noted earlier, Chedwick's claim that UPMC unlawfully "used" his medical information to engage in disability-based discrimination is inextricably intertwined with his original claim that UPMC refused to rehire him because of his "disability."  *Holiday v. City of Chattanooga*, 206 F.3d 637, 645 (6th Cir. 2000)(applying the anti-discrimination standards applicable under § 12112(a) to an employer's alleged misuse of information obtained during the course of a post-offer medical examination).  The same could not be said of a claim involving the improper disclosure of medical information, which cannot be gleaned from a fair reading of Chedwick's complaint.  ECF No. 1 at ¶¶ 10-38.

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **GARY CHEDWICK,** | ) | |
| **Individually, and on behalf of a group** | ) | |
| **of similarly situated individuals,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No. 07-806** |
| | ) | |
| **UPMC d/b/a UNIVERSITY OF** | ) | |
| **PITTSBURGH MEDICAL CENTER,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## ORDER OF COURT

AND NOW, this 21st day of April, 2011, in accordance with the foregoing Memorandum Opinion, it is hereby **ORDERED**, **ADJUDGED** and **DECREED** that the Plaintiff's Motion for Class Certification (*Document No. 57*) is **DENIED**.

BY THE COURT:

s/ Terrence F. McVerry
Terrence F. McVerry
United States District Judge

cc:     All counsel of record